## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 24-60040-CIV-LEIBOWITZ/Hunt

SOUTHERN CROSS SEAFOODS, LLC,

        Plaintiff,

   v.

UNITED STATES, *et al.*,

        Defendants.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... iii

LIST OF ACRONYMS, INITIALISMS, AND ABBREVIATIONS .......................... vii

INTRODUCTION ............................................................................................................1

LEGAL BACKGROUND ...............................................................................................2

    I.    The Convention on the Conservation of Antarctic Marine Living Resources and the Commission for the Conservation of Antarctic Marine Living Resources .......................................................................................................2

        A.    Relevant Conservation Measures Adopted Pursuant to Article IX ............3

        B.    Implementation of Conservation Measures by Members of the Commission .........................................................................................6

    II.    The Antarctic Marine Living Resources Convention Act of 1984 ........................6

        A.    AMLRCA's Implementing Regulations ....................................................7

STATEMENT OF FACTS ...............................................................................................8

    I.    CCAMLR's Failure to Adopt Proposed Catch Limits for Toothfish in Subarea 48.3 for the 2021/22 Fishing Season ..........................................................8

    II.    Plaintiff's Preapproval Application and NMFS's Denial ........................................9

LEGAL STANDARD ....................................................................................................10

ARGUMENT ..................................................................................................................11

    I.    AMLRCA and its implementing regulations bar NMFS from issuing a preapproval certificate for a toothfish shipment harvested in contravention of a CCAMLR conservation measure in force—here, CM 31-01. .......................11

    II.    The history, purpose, and structure of the Convention support NMFS's determination. .....................................................................................................14

        A.    The history of CM 31-01 and the objective of the Convention support NMFS's conclusion that the toothfish in Plaintiff's shipment was harvested in contravention of CM 31-01. ...........................................14

B.   Denying Plaintiff's request to import toothfish harvested in
contravention of CM 31-01 fulfills U.S. legal obligations under the
Convention. ...............................................................................................15

C.   Approving Plaintiff's request to import toothfish harvested in
contravention of CM 31-01 would destabilize the Convention's
consensus-based structure for cooperative and collective action. .............17

III.   NMFS addressed counterarguments and fully explained why harvesting
toothfish from Subarea 48.3 in the absence of a seasonal catch limit for that
toothfish fishery does not comply with CM 31-01. ................................................18

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Cahaba Riverkeeper v. EPA,*
   938 F.3d 1157 (11th Cir. 2019) ................................................................. 13

*Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.,*
   677 F.3d 1073 (11th Cir. 2012) ................................................................. 10

*Feaz v. Wells Fargo Bank, N.A.,*
   745 F.3d 1098 (11th Cir. 2014) ................................................................. 11

*Heyman v. Cooper,*
   31 F.4th 1315 (11th Cir. 2022) ................................................................. 11

*Kisor v. Wilkie,*
   588 U.S. 558 (2019) ................................................................................. 13

*Landau v. RoundPoint Mortg. Servicing Corp.,*
   925 F.3d 1365 (11th Cir. 2019) ........................................................... 11, 12

*Lowman v. Fed. Aviation Admin.,*
   83 F.4th 1345 (11th Cir. 2023) ................................................................. 10

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ................................................................................. 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................... 10

*N. Buckhead Civic Ass'n v. Skinner,*
   903 F.2d 1533 (11th Cir. 1990) ................................................................. 10

*S. Cross Seafoods, LLC v. United States,*
   668 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ........................................... 6, 7

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   295 F.3d 1209 (11th Cir. 2002) ................................................................. 10

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ................................................................................. 13

*Umbach v. Carrington Inv. Partners (US), LP,*
   851 F.3d 147 (2d Cir. 2017) ..................................................................... 12

*United States v. DBB, Inc.,*
   180 F.3d 1277 (11th Cir. 1999) ................................................................. 11

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) ................................................................................. 10

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................... 10

16 U.S.C. § 2431 ........................................................................................... 6

16 U.S.C. § 2431(a)(1) ............................................................................. 6, 16

16 U.S.C. § 2431(a)(2) .................................................................................. 6

16 U.S.C. § 2431(a)(4) .................................................................................. 6

16 U.S.C. § 2434(a) ........................................................................... 7, 16, 17

16 U.S.C. § 2434(a)(1) .................................................................................. 6

16 U.S.C. § 2435(3) ...................................................................... 7, 12, 16, 17

16 U.S.C. § 2436(a) ...................................................................................... 7

**Treaties**

33 UST 3476 .................................................................................................. 6

**Regulations**

50 C.F.R. part 300, subpart G ....................................................................... 7

50 C.F.R. § 300.101 ...................................................................................... 3

50 C.F.R. § 300.100(a) .................................................................................. 7

50 C.F.R. § 300.100(b)(2) ............................................................................. 7

50 C.F.R. § 300.105(d) ............................................................................. 7, 18

50 C.F.R. § 300.105(h) .................................................................................. 8

50 C.F.R. § 300.105(h)(2) ..................................................................... *passim*

50 C.F.R. § 300.106(a)(1) ............................................................................. 7

50 C.F.R. § 300.106(a)(2) ............................................................................. 7

50 C.F.R. § 300.106(a)(3) ............................................................................. 7

50 C.F.R. § 300.114(d) .................................................................................. 8

65 Fed. Reg. 30014 (May 10, 2000) ........................................................... 19

54 Fed. Reg. 6407 (Feb. 10, 1989) ............................................................. 19

89 Fed. Reg. 20133 (Mar. 21, 2024) ............................................................. 8

**CAMLR Convention**

Art. I(2) .................................................................................................... 2

Art. II ..................................................................................................... 17

Art. II(1) ................................................................................................. 2

Art. II(2) ............................................................................................ 2, 16

Art. II(3) ............................................................................................ 2, 16

Art. IX .......................................................................................... 1, 4, 16, 17

Art. IX(1)(f) ........................................................................................ 3, 16

Art. IX(2)(a)–(i) ...................................................................................... 3

Art. IX(2)(a) ........................................................................................ 3, 16

Art. IX(2)(c) ........................................................................................ 3, 16

Art. IX(3) ................................................................................................ 3

Art. IX(6) ....................................................................................... 6, 16, 17

Art. IX(6)(a) ........................................................................................... 6

Art. IX(6)(b) ........................................................................................... 6

Art. IX(6)(c) ........................................................................................... 6

Art. IX(6)(d) ........................................................................................... 6

Art. VII(1) .............................................................................................. 3

Art. VII(2) .............................................................................................. 3

Art. XII ................................................................................................. 17

Art. XII(1) ......................................................................................... 3, 17

Art. XXI(1) ............................................................................................ 16

**CCAMLR Conservation Measures**

CM 7/V ............................................................................................... 4, 5

CM 10-05 ................................................................................................. 5

CM 24/IX ............................................................................................ 5, 19

CM 31-01 ......................................................................................... *passim*

CM 32-02 ...................................................................................... 5, 18, 19

CM 41-02 ......................................................................................... *passim*

CM 170/XVIII ..................................................................................... 5, 19

CM 170/XIX ................................................................................................................. 5

CM 170/XX .................................................................................................................. 5

**Other Authorities**

CCAMLR, Report of the Fifth Meeting of the Commission, 1986,
    https://meetings.ccamlr.org/system/files/e-cc-v.pdf (last visited June 10, 2024)......... 3, 4, 5, 14

CCAMLR, Report of the Thirty-First Meeting of the Commission, 2012,
    https://meetings.ccamlr.org/system/files/e-cc-xxxi.pdf (last visited June 10, 2024)................. 5

CCAMLR, Report of the Thirty-Sixth Meeting of the Commission, 2017,
    https://meetings.ccamlr.org/system/files/e-cc-xxxvi_1.pdf (last visited June 10, 2024)............ 8

CCAMLR, Report of the Thirty-Eighth Meeting of the Commission, 2019,
    https://www.ccamlr.org/en/system/files/e-cc-38_0.pdf (last visited June 10, 2024)................. 8

CCAMLR, Report of the Fortieth Meeting of the Commission, 2021,
    https://meetings.ccamlr.org/system/files/e-cc-40-rep.pdf (last visited June 10, 2024). ... 8, 9, 15

CCAMLR, Status of the Convention,
    https://www.ccamlr.org/en/organisation/status-list-contracting-parties
    (last visited June 10, 2024). ....................................................................................... 3

CCAMLR, Map of the CAMLR Convention Area, Oct. 2017,
    https://www.ccamlr.org/en/system/files/CCAMLR-Convention-Area-Map.pdf
    (last visited June 10, 2024). ....................................................................................... 4

*Contravene*, BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................... 12

*Contravention*, BLACK'S LAW DICTIONARY (11th ed. 2019) ...................................... 12

*In force*, BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................ 12

*Violation*, BLACK'S LAW DICTIONARY (11th ed. 2019) .............................................. 12

## LIST OF ACRONYMS, INITIALISMS, AND ABBREVIATIONS

| | |
|---|---|
| AMLRCA | Antarctic Marine Living Resources Act of 1984 |
| APA | Administrative Procedure Act |
| CAMLR Convention or Convention | Convention on the Conservation of Antarctic Marine Living Resources |
| CCAMLR or Commission | Commission for the Conservation of Antarctic Marine Living Resources |
| CDS | Catch Documentation Scheme |
| CM | Conservation Measure |
| DCD | *Dissostichus* Catch Document |
| NMFS | National Marine Fisheries Service |
| Subarea 48.3 | Statistical Subarea 48.3 |

Defendants the United States and the National Marine Fisheries Service (collectively, "NMFS") move for summary judgment on all claims asserted in the Complaint filed by Plaintiff Southern Cross Seafoods, LLC, D.E. 14.

## INTRODUCTION

For four decades, the Convention on the Conservation of Antarctic Marine Living Resources ("CAMLR Convention" or "Convention") has promoted the conservation of Antarctic populations of finfish, mollusks, crustaceans, and other species. Article IX established the Convention's governing body—the Commission for the Conservation of Antarctic Marine Living Resources ("Commission" or "CCAMLR")—to carry out the Convention's conservation objective and principles by adopting legally binding conservation measures by consensus during its annual meetings, among other duties. For fisheries within the Convention area, conservation measures impose catch limits and other requirements for harvesting activities, including bycatch mitigation, reporting, and monitoring. The United States is a Contracting Party to the Convention and a Member of the Commission, and one of the ways it implements its obligations under the Convention is through the Antarctic Marine Living Resources Convention Act of 1984 ("AMLRCA") and its regulations.

This case is about Plaintiff's attempt to import a shipment of a species of finfish— *Dissostichus eleginoides*, or Patagonian toothfish, marketed in the United States as Chilean seabass ("toothfish")—harvested from the toothfish fishery in Statistical Subarea 48.3 ("Subarea 48.3"), a fishery within the Convention area subject to Conservation Measure ("CM") 31-01, which directs the Commission to set limitations on catch or equivalent measures, as necessary, for each fishing season. The Commission failed to reach consensus on a conservation measure to manage catch and set other requirements for the toothfish fishery in Subarea 48.3 for the 2021/22 year during which Plaintiff harvested the toothfish at issue. Therefore, in accordance with AMLRCA and its regulations, NMFS determined that the toothfish Plaintiff sought to import was harvested in contravention of CM 31-01 and denied Plaintiff's application for preapproval to import the toothfish shipment in accordance with the AMLRCA regulations at 50 C.F.R. § 300.105(h)(2). Plaintiff now challenges NMFS's denial of its preapproval application under the Administrative Procedure Act ("APA").

NMFS's denial of Plaintiff's application for preapproval to import the toothfish shipment complies with the plain language of AMLRCA and its implementing regulations. The regulations do not authorize NMFS to issue a preapproval certificate for any toothfish shipment harvested in violation or contravention of any CCAMLR conservation measure in force at the time of harvest—in fact, they *require* NMFS to deny preapproval to import such a shipment. NMFS's decision also promotes the purposes of AMLRCA and the sole objective of the Convention—to conserve Antarctic marine living resources. In contrast, a decision to allow importation of Plaintiff's toothfish shipment would undermine the Convention's objective and its consensus-based decision-making structure. Such a decision could create an incentive for any Member of the Commission to simply block consensus on the relevant conservation measure and then carry out harvesting activities unimpeded and without consequence. It is not hard to see how the Convention's consensus-based framework for conserving Antarctic marine living resources could crumble in the wake of such precedent.

For these reasons, as demonstrated in detail below, the Court should uphold NMFS's decision and grant Defendants' motion for summary judgment.

## LEGAL BACKGROUND

### I. The Convention on the Conservation of Antarctic Marine Living Resources and the Commission for the Conservation of Antarctic Marine Living Resources

The Convention, which was signed in May 1980 and entered into force in April 1982, aims to conserve Antarctic marine living resources, including Antarctic populations of finfish, mollusks, crustaceans, and sea birds. CAMLR Convention, Arts. I(2), II(1). Conservation includes "rational use" of these marine living resources. *Id.*, Art. II(2). Any harvesting of these marine living resources in the Convention area "shall be conducted in accordance" with the Convention's provisions and with specified conservation principles, including "prevention of decrease in the size of any harvested population to levels below those which ensure its stable recruitment" and "restoration of depleted populations to" such levels; "maintenance of the ecological relationships between harvested, dependent[,] and related populations of Antarctic marine living resources"; and "prevention of changes or minimization of the risk of changes in the marine ecosystem which are not potentially reversible over two or three decades." *Id.*, Art. II(3).

Today, there are 37 Contracting Parties to the Convention; 26 States and the European Union are Members of the Commission.[1] *Id.*, Art. VII(1)–(2).

To give effect to the Convention's objective and conservation principles, Article IX requires the Commission to "formulate, adopt[,] and revise conservation measures on the basis of the best scientific evidence available."[2] *Id.*, Art. IX(1)(f). These conservation measures include "the designation of the quantity of any species which may be harvested in the area to which th[e] Convention applies" and "the designation of the quantity which may be harvested from the populations of regions and sub-regions," i.e., catch limits. *Id.*, Art. IX(2)(a), (c). "Decisions of the Commission on matters of substance," including conservation measures imposing catch limits, are made "by consensus." *Id.*, Art. XII(1). The Commission publishes and maintains "a record of all conservation measures in force." *Id.*, Art. IX(3).

### A.   Relevant Conservation Measures Adopted Pursuant to Article IX

At the Fifth Meeting of the Commission in 1986, the Commission had a "divergence in views . . . over limitations of catch in Subarea 48.3." CCAMLR, Report of the Fifth Meeting of the Commission ("Fifth Meeting Report"), 1986, ¶ 51, https://meetings.ccamlr.org/system/files/e-cc-v.pdf (last visited June 10, 2024); *see also* AR000084 n.5 (citing Fifth Meeting Report at 16). Subarea 48.3 is shown in the upper left corner of Figure 1 below:

---

[1] A Contracting Party is a State (i.e., a nation-state) or a "regional economic integration organization" that "has committed to the Convention through ratification, acceptance, approval[,] or accession. Members include those Contracting Parties that participated in the first meeting at which the Convention was adopted in 1980, as well as States that have subsequently acceded to the Convention and been accepted as Members by the Commission." CCAMLR, Status of the Convention, https://www.ccamlr.org/en/organisation/status-list-contracting-parties (last visited June 10, 2024).

[2] The Convention uses the term "conservation measure" broadly to include all types of measures aimed at conserving Antarctic marine living resources. CAMLR Convention, Art. IX(2)(a)–(i). These measures include CM 31-01 as well as CM 41-02, the conservation measure established pursuant to CM 31-01 that included catch limits and which lapsed at the end of the 2020/21 fishing season. *See infra.*; *see also* 50 C.F.R. § 300.101 (defining an "[a]nnual or biennial measure" as a measure that "[a]pplies to the operation of the Convention's commercial or exploratory fisheries such as gear, catch, and effort restrictions and time and area closures" and stating that these "[g]enerally expire[] after one or two fishing season(s)").



**Figure 1: Map of the CAMLR Convention Area[3]**

While some Members believed that limits set at the amount of catch for the 1985/86 season were appropriate for the 1986/87 season, others viewed those levels as "inconsistent with the advice of the Scientific Committee" on the need for measures to promote recovery of depleted fish stocks. Fifth Meeting Report ¶ 51. Although "the Commission could not reach agreement on a limitation of catch for Subarea 48.3," the Members of the Commission "agreed that such limitations of catch or equivalent measures should be established for the 1987–88 season, at next year's annual meeting, when data resulting from planned fishery surveys in the area would be available." *Id.* ¶ 52. Thus, in accordance with Article IX of the Convention, CCAMLR adopted CM 7/V, now categorized as CM 31-01:

> Without prejudice to other conservation measures adopted by the Commission, for species upon which fisheries are permitted around South Georgia (Statistical Subarea 48.3), the Commission shall, at its 1987 Meeting, adopt limitations on catch, or equivalent measures, binding for the 1987/88 season.

---

[3] CCAMLR, Map of the CAMLR Convention Area, Oct. 2017, https://www.ccamlr.org/en/ system/files/CCAMLR-Convention-Area-Map.pdf (last visited June 10, 2024).

Such limitations of catch or equivalent measures shall be based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia.

For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season.

CM 31-01 (1986); *see also* Fifth Meeting Report ¶¶ 48 (adopting CM 7/V "in accordance with Article IX of the Convention"), 53.

At the Ninth Meeting of the Commission in October 1990, CCAMLR adopted the first catch limit for toothfish (*Dissostichus eleginoides*) in Subarea 48.3, which was in effect for the 1990/91 season. *See* CM 24/IX (1990). At each of the subsequent annual meetings until the Fortieth Meeting of the Commission in October 2021, the Commission adopted, by consensus, a conservation measure for the toothfish fishery in Subarea 48.3 for each fishing season. AR000084. These conservation measures included catch limits for that fishery and other requirements such as gear restrictions, bycatch limitations, and bycatch mitigation, observer, and reporting requirements. The most recent toothfish catch limit in Subarea 48.3 was in effect for the 2019/20 and 2020/21 fishing seasons. *See* CM 41-02 (2019).

To inhibit trade of illegal catches, CCAMLR adopted CM 10-05, which established a Catch Documentation Scheme ("CDS") for tracking toothfish from harvest through the trade cycle, including transshipment, landing, import, export, and re-export, no matter where the toothfish was harvested. *See* CM 170/XVIII (1999); CM 170/XIX (2000); CM 170/XX (2001); CM 10-05 (2002–2022). CM 10-05 prohibits the importation of toothfish if there is a determination by the importing State that "the *Dissostichus* spp. were not harvested in a manner consistent with CCAMLR conservation measures." CM 10-05 ¶ 13 (2021).

In 1998, the Commission adopted CM 32-02 to prohibit directed fishing for finfish in Subarea 48.1. The Commission later adopted a revised CM 32-02 that consolidated prohibitions on directed fishing contained in 15 other conservation measures. *See* CCAMLR, Report of the Thirty-First Meeting of the Commission, 2012, ¶ 7.22, https://meetings.ccamlr.org/system/files/ e-cc-xxxi.pdf (last visited June 10, 2024). To date, the Commission has not adopted a revision to CM 32-02 to include a prohibition on directed fishing for *Dissostichus eleginoides* in all of Subarea 48.3. *See* CM 32-02 (2017). But CM 41-02 has included a catch limit of zero for

toothfish in one portion of Subarea 48.3—Management Area A— since 2004. *See* CM 41-02 (2004–2019).

  **B.**  **Implementation of Conservation Measures by Members of the Commission**

  Article IX(6) of the Convention explains how Members of the Commission must implement conservation measures adopted by the consensus of the Commission. To begin, the Commission must notify all Members of conservation measures adopted by consensus. CAMLR Convention, Art. IX(6)(a). After 180 days have passed, those "conservation measures shall become binding upon all Members of the Commission" unless one of the following exceptions applies. *Id.*, Art. IX(6)(b). First, if a Member of the Commission notifies the Commission within 90 days "that it is unable to accept the conservation measure, in whole or in part, the measure shall not, to the extent stated, be binding upon that Member of the Commission[.]" *Id.*, Art. IX(6)(c). Second, upon receiving any such notification, "the Commission shall meet at the request of any Member of the Commission to review the conservation measure." *Id.*, Art. IX(6)(d). At the meeting and within 30 days thereafter, "any Member of the Commission shall have the right to declare that it is no longer able to accept the conservation measure, in which case the Member shall no longer be bound by such measure." *Id.*

**II.**  **The Antarctic Marine Living Resources Convention Act of 1984**

  The United States is a Contracting Party to the Convention and a Member of the Commission. *See* 33 UST 3476. The United States implements elements of the Convention through AMLRCA, 16 U.S.C. § 2431, *et seq.* In enacting AMLRCA, Congress found that the Convention "establishes international mechanisms and creates legal obligations necessary for the protection and conservation of Antarctic marine living resources," "incorporates . . . standards designed to ensure the health of the individual populations and species and to maintain the health of the Antarctic marine ecosystem as a whole," and "represents an important contribution to United States long term legal and political objectives of maintenance of Antarctica as an area of peaceful international cooperation." *Id.* § 2431(a)(1), (2), (4).

  Section 2434 of AMLRCA authorizes the Secretary of State, with the concurrence of the Secretary of Commerce and the Director of the National Science Foundation, "to decide on behalf of the United States whether the United States is unable to accept or can no longer accept a conservation measure adopted by the Commission pursuant to [A]rticle IX of the Convention, and . . . to notify the Commission of any such decision." *Id.* § 2434(a)(1); *see also S. Cross*

*Seafoods, LLC v. United States*, 668 F. Supp. 3d 1324, 1337 n.12 (Ct. Int'l Trade 2023) ("The AMLRCA regulations provide for a process by which the United States can determine not to accept a conservation measure.") (citing 16 U.S.C. § 2434(a)). If the Secretary of State makes no such decision or notification, a conservation measure adopted by the Commission pursuant to Article IX(6) of the Convention becomes binding on the United States.

Section 2435(3) of AMLRCA prohibits importing "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure in force with respect to the United States pursuant to Article IX of the Convention[.]" 16 U.S.C. § 2435(3).

### A.   AMLRCA's Implementing Regulations

Section 2436 of AMLRCA authorizes the Secretary of Commerce, after consultation with the Secretary of State and other relevant officials, to promulgate regulations as necessary and appropriate to implement the statute. *Id.* § 2436(a). Acting under that authority, NMFS has implemented Commission-adopted conservation measures that are binding on the United States through regulations found at 50 C.F.R. part 300, subpart G. *See* 50 C.F.R. § 300.100(a). The regulations govern "[t]he import . . . into the United States of any Antarctic marine living resource." *Id.* § 300.100(b)(2).

Through these regulations, NMFS has implemented U.S. obligations under the CCAMLR CDS, among other requirements, to monitor U.S. trade in Antarctic marine living resources. NMFS determines whether a toothfish may be imported on a shipment-by-shipment basis. Each shipment of toothfish must include a CCAMLR CDS document. *Id.* § 300.106(a)(1). No toothfish shipment "shall be released for entry into the United States unless accompanied by an accurate, complete, valid and validated CCAMLR CDS document," *id.* § 300.106(a)(2), and "unless all of the applicable requirements of the CCAMLR Conservation Measures and U.S. regulations have been met." *Id.* § 300.106(a)(3).

A NMFS-issued preapproval certificate is required to import any shipment of frozen toothfish into the United States. *Id.* § 300.105(a). NMFS "may issue a preapproval certificate" to import a toothfish shipment if it determines that the toothfish was "not harvested in violation of any CCAMLR conservation measure or in violation of any regulation in [50 C.F.R. part 300, subpart G]," among other requirements. *Id.* § 300.105(d). "NMFS will not issue a preapproval certificate" for any toothfish shipment "[d]etermined to have been harvested or transshipped in contravention of any CCAMLR Conservation Measure in force at the time of harvest or

transshipment." *Id.* § 300.105(h)(2) (2019);[4] *see also id.* § 300.114(d) (prohibiting "[s]hip[ping], transport[ing], offer[ing] for sale, sell[ing], purchas[ing], import[ing], export[ing], re-export[ing] or hav[ing] custody, control or possession of, any [Antarctic marine living resource] that was harvested in violation of a conservation measure in force with respect to the United States under Article IX of the Convention . . . ").

**STATEMENT OF FACTS**

**I.     CCAMLR's Failure to Adopt Proposed Catch Limits for Toothfish in Subarea 48.3 for the 2021/22 Fishing Season**

Until 2021, at annual meetings, CCAMLR generally endorsed the advice of the Scientific Committee on a catch limit for the toothfish fishery in Subarea 48.3 and adopted CM 41-02 containing the catch limits and other regulatory measures for that fishery. *See, e.g.*, CCAMLR, Report of the Thirty-Eighth Meeting of the Commission, 2019, ¶ 9.13, https://www.ccamlr.org/ en/system/files/e-cc-38_0.pdf (last visited June 10, 2024); CCAMLR, Report of the Thirty-Sixth Meeting of the Commission, 2017, ¶ 8.15, https://meetings.ccamlr.org/system/files/e-cc-xxxvi_1.pdf (last visited June 10, 2024). At its Fortieth Meeting in October 2021, however, CCAMLR failed to reach consensus on a conservation measure setting catch limits for the toothfish fishery in Subarea 48.3 for the 2021/22 fishing season after considering a proposed CM 41-02 containing catch limits and other measures. *See* CCAMLR, Report of the Fortieth Meeting of the Commission ("Fortieth Meeting Report"), 2021, ¶ 6.21, https://meetings.ccamlr.org/ system/files/e-cc-40-rep.pdf (last visited June 10, 2024); AR000084 n.6 (citing Fortieth Meeting Report ¶¶ 6.18–6.22, 6.26–6.32, 6.35). The Commission reviewed the Scientific Committee's advice regarding catch limits for the toothfish fishery in Subarea 48.3, which "[m]ost Members noted" was "based on the best available science." Fortieth Meeting Report ¶ 6.19; AR000084 n.6. "Many Members voiced their concerns at the unprecedented situation where for the first time the catch limit for an established fishery was blocked, and the Commission was not adhering to its commitment to utili[z]e the best scientific evidence available in its decisionmaking." Fortieth Meeting Report ¶ 6.20; AR000084 n.6.

---

[4] Citations to the AMLRCA regulations refer to the 2019 annual edition of the Code of Federal Regulations because that was the edition that was in place when the challenged Denial Letter was issued. Some of the provisions of the regulations have since been revised, including 50 C.F.R. § 300.105(h), *see* 89 Fed. Reg. 20133, 20134, 20137 (Mar. 21, 2024), but the revised versions did not apply to the Denial Letter at issue.

8

Several Members also made statements at the Meeting conveying their concerns about the effect of the Commission's failure to adopt a catch limit on the toothfish fishery in Subarea 48.3 for the 2021/22 fishing season. The United Kingdom stated that "Russia's block on a scientifically determined catch limit for the toothfish fishery in Subarea 48.3, contrary to the management advice from the Scientific Committee . . . , marks the first time in CCAMLR's 40-year history that an established fishery has been completely blocked, and it results in a failure of CM 31-01." Fortieth Meeting Report ¶ 6.22; AR000084 n.7 (quoting Fortieth Meeting Report ¶ 6.22). The European Union remarked that the proposed catch limits for toothfish in Subarea 48.3 were "based on the best available science and consistent with CCAMLR decision rules and established CCAMLR procedures," and that "there is no scientific basis for closing the fishery." Fortieth Meeting Report ¶ 6.28; AR000084 n.7 (quoting Fortieth Meeting Report ¶ 6.28). The United States noted that "[t]he U.S.A. does not believe there is a scientific basis to close the toothfish fishery in Subarea 48.3" and advocated adopting the proposed catch limits for toothfish in Subarea 48.3 at the levels indicated in the Scientific Committee's report. Fortieth Meeting Report ¶ 6.30; AR000084 n.7 (quoting Fortieth Meeting Report ¶ 6.30).

## II.    Plaintiff's Preapproval Application and NMFS's Denial

In August 2022, nearly a year after the Fortieth Meeting of the Commission, NMFS received an application from Plaintiff for a preapproval certificate to import frozen toothfish. *See* AR000056–60. According to the *Dissostichus* Catch Document ("DCD") included in the application, the toothfish Plaintiff sought to import was caught in Subarea 48.3 in June and July 2022. AR000057.

In September 2022, NMFS denied Plaintiff's preapproval application. *See* AR000083–86 ("Denial Letter"); AR000020 (signed decision memorandum). Citing the prohibition in AMLRCA's regulations at 50 C.F.R. § 300.105(h)(2), NMFS explained that it was "not issuing a pre-approval certificate because . . . the toothfish at issue was harvested in contravention of CCAMLR CM 31-01." AR000086. NMFS elaborated that, "[i]n the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures." *Id.*; *see also* AR000085 ("For the 2021/22 fishing season, CCAMLR failed to adopt catch limits or other measures as necessary in accordance with CM 31-01. Therefore, even if the toothfish at issue was harvested in compliance with other applicable conservation measures, . . . that does not

9

make the harvest *authorized* in accordance with CM 31-01."). In the Denial Letter, NMFS also pointed to CCAMLR Members' statements about the effect of failing to adopt a catch limit on the toothfish fishery in Subarea 48.3 for the 2021/22 fishing season. *See* AR000084 ("[S]everal of the statements made in the Commission reflect the view that failure to reach consensus on catch limits effectively closes the fishery."); *see also id.* n.7 (referencing statements from the United Kingdom, European Union, and United States). NMFS responded to several counterarguments and addressed some policy implications of a contrary decision. *See* AR000084–85.

## LEGAL STANDARD

Under the APA, a court may "hold unlawful and set aside agency action, findings, and conclusions" only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). "The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action" but instead may set aside an agency action "'only for substantial procedural or substantive reasons as mandated by statute[.]'" *Id.* at 1539 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). The reviewing court may only overturn the agency's decision if:

(1) the decision does not rely on factors that Congress intended the agency to consider;
(2) the agency failed entirely to consider an important aspect of the problem;
(3) the agency offers an explanation which runs counter to the evidence; or
(4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1354 (11th Cir. 2023) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002)). So long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," its decision must be upheld. *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1077 n.9 (11th Cir. 2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

The Court should uphold NMFS's denial of Plaintiff's application for preapproval to import the toothfish shipment because the toothfish was harvested from Subarea 48.3 in the absence of a necessary catch limit and thus in contravention of CM 31-01. AMLRCA and its implementing regulations compel NMFS to deny approval for any toothfish shipment harvested in violation or contravention of any CCAMLR conservation measure in force at the time of harvest. Moreover, NMFS's determination that the toothfish was harvested in contravention of CM 31-01 upholds AMLRCA's purposes, the Convention's sole objective to conserve Antarctic marine living resources, and the Commission's consensus-based decision-making structure. Finally, NMFS explained why counterarguments that the toothfish Plaintiff sought to import was harvested in accordance with CM 31-01 even without a necessary catch limit were incorrect. NMFS's denial complies with AMLRCA and its regulations and offers a rational explanation supported by the record.

**I.    AMLRCA and its implementing regulations bar NMFS from issuing a preapproval certificate for a toothfish shipment harvested in contravention of a CCAMLR conservation measure in force—here, CM 31-01.**

NMFS's denial decision was rational because the plain language of the statutory and regulatory provisions at issue does not permit imports of toothfish harvested in contravention of a CCAMLR conservation measure in force. To prevent violations of AMLRCA's statutory prohibition on importing an Antarctic marine living resource harvested in violation of a CCAMLR conservation measure in force with respect to the United States, AMLRCA's regulations prohibit NMFS from issuing a preapproval certificate for a shipment of toothfish harvested in contravention of a CCAMLR conservation measure in force.

In interpreting a statute, the Court "start[s] with the text—and, if [the Court] find[s] it clear, [the Court] end[s] there as well." *Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022) (internal quotation marks and citation omitted). The Court does not "look at one word or term in isolation, but instead [] look[s] to the entire statutory context." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) (citation omitted). The same approach applies to interpreting regulations. *See Landau v. RoundPoint Mortg. Servicing Corp.*, 925 F.3d 1365, 1369 (11th Cir. 2019) (when interpreting a regulation, the Court "begin[s] with the language of the regulation, just as [it] do[es] for statutes") (citing *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1105–06 (11th Cir. 2014)).

AMLRCA prohibits importing "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure in force with respect to the United States pursuant to [A]rticle IX of the Convention[.]" 16 U.S.C. § 2435(3). The regulations at 50 C.F.R. § 300.105(h)(2) implement this legal obligation for toothfish and provide that "NMFS will not issue a preapproval certificate" for any toothfish shipment "[d]etermined to have been harvested or transshipped in contravention of any CCAMLR Conservation Measure in force at the time of harvest or transshipment."

Neither AMLRCA nor its regulations define "in violation of," "in contravention of," or "in force." The Court thus should "look to the common usage of the[se] phrase[s] for [their] meaning, . . . enlist[ing] the aid of dictionaries." *Landau*, 925 F.3d at 1370 (citations omitted). "Violation" means "[a]n infraction or breach of the law; a transgression." *Violation*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Contravene" means "[t]o violate or infringe (the law, a rule, etc.); to defy" or "[t]o come into conflict with; to be contrary to." *Contravene*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Contravention*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An act violating a legal condition or obligation"); *Umbach v. Carrington Inv. Partners (US), LP*, 851 F.3d 147, 159 (2d Cir. 2017) ("To 'contravene' means 'to . . . act contrary to' something, or 'to obstruct [its] operation.' . . . [T]o 'contravene a law' means 'to infringe or disregard' it[.]") (citation omitted). "In force" means "[i]n effect; operative; binding." *In force*, BLACK'S LAW DICTIONARY (11th ed. 2019).

The application of these definitions here makes clear that under 16 U.S.C. § 2435(3) and 50 C.F.R. § 300.105(h)(2), NMFS cannot issue a preapproval certificate for any toothfish shipment harvested in violation or disregard of, or contrary to, any binding CCAMLR conservation measure that was in effect, or operative, when the harvest occurred. Because no CCAMLR catch limit or equivalent measure was in place for the established toothfish fishery in Subarea 48.3 when the toothfish Plaintiff sought to import was harvested from Subarea 48.3 in June and July 2022, the toothfish was harvested in disregard of—or contrary to—CM 31-01's directive for the Commission to establish a catch limit or equivalent measures for fisheries in Subarea 48.3 as necessary for each fishing season. For this reason, NMFS correctly determined that the toothfish could not be imported and denied Plaintiff's application for a preapproval certificate.

As NMFS concluded in its Denial Letter, 50 C.F.R. § 300.105(h)(2) bars NMFS from issuing a preapproval certificate for the toothfish Plaintiff sought to import because the toothfish was harvested in contravention of CM 31-01. *See* AR000086 ("In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures."). CM 31-01 was in effect—or operative—in June and July 2022, when the toothfish Plaintiff sought to import was harvested from Subarea 48.3. The third sentence of CM 31-01 requires the Commission, "[f]or each fishing season after 1987/88," to "establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season." The first sentence of CM 31-01 clarifies that "such limitations or other measures" refers to "limitations on catch, or equivalent measures, binding" for a particular fishing season, and the second sentence of CM 31-01 specifies that "on a similar basis" refers to catch limits or equivalent measures "based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia." Thus, in accordance with CM 31-01, the Commission needed to establish a catch limit or equivalent measure for toothfish in Subarea 48.3 for the 2021/22 fishing season, consistent with the advice of the Scientific Committee and data from fishery surveys. Because the Commission failed to adopt the necessary catch limit or equivalent measures, the toothfish harvested during the 2021/22 fishing season and proposed for import therefore was harvested in contravention of CM 31-01.[5]

---

[5] As explained above, the plain language of the statute and regulations is clear. If Plaintiff argues otherwise, or if the Court finds the statute or regulations ambiguous, NMFS's reading of the statute and regulations to prohibit the importation of toothfish harvested from Subarea 48.3 in the absence of a necessary catch limit or equivalent measure because such harvest is a violation of a conservation measure is the best interpretation of those provisions and entitled to deference. *See Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1164 (11th Cir. 2019) (agency interpretation of an ambiguous statute warrants deference so long as it is a permissible construction of the statute); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (agency interpretations deserve deference to the extent that they have "power to persuade"); *Kisor v. Wilkie*, 588 U.S. 558, 573–79 (2019) (court should defer to an agency's interpretation of a "genuinely ambiguous" regulation if that interpretation is "reasonable," "authoritative," and "implicate[s] [the agency's] substantive expertise").

II.     **The history, purpose, and structure of the Convention support NMFS's determination.**

    A.     **The history of CM 31-01 and the objective of the Convention support NMFS's conclusion that the toothfish in Plaintiff's shipment was harvested in contravention of CM 31-01.**

The Fifth Meeting Report underscores that CM 31-01 reflects the Commission's consensus that fisheries in Subarea 48.3 need binding catch limits or equivalent measures based on the advice of the Scientific Committee to give effect to the Convention's objective of conserving Antarctic marine living resources. At that Meeting, the Commission had a "divergence in views . . . over limitations of catch in Subarea 48.3." Fifth Meeting Report ¶ 51; *see* AR000084 n.5 (citing Fifth Meeting Report at 16). While some Members believed that limits set at the level of catch for the previous 1985/86 season were appropriate, others viewed those levels as too high and therefore "inconsistent with the advice of the Scientific Committee" on the need for measures to promote recovery of depleted stocks. Fifth Meeting Report ¶ 51. In other words, the question was whether catch limits should be set at the status quo level or lowered to allow overfished stocks to rebuild. The Commission failed to agree on catch limits at that time. Instead, the Commission adopted CM 31-01 because its Members "agreed that such limitations of catch or equivalent measures should be established for the 1987–88 season, at next year's annual meeting, when data resulting from planned fishery surveys in the area would be available." *Id.* ¶ 52. CM 31-01 therefore reflects the view that, to conserve Antarctic marine living resources affected by fisheries in Subarea 48.3, harvest activities in Subarea 48.3 should be conducted in accordance with necessary catch limits or equivalent measures based on the advice of the Scientific Committee as informed by survey data about the health of fish stocks. In the context of the history of CM 31-01's adoption and given the Convention's conservation objective, harvesting Antarctic marine living resources like toothfish from fisheries in Subarea 48.3 in the absence of CCAMLR measures adopting necessary catch limits or equivalent measures disregards, and therefore is contrary to, both the text and purpose of CM 31-01.

This principle is illustrated and supported by consideration of the opposite interpretation of CM 31-01. That is, if harvest activities in Subarea 48.3 conducted in the absence of a catch limit or equivalent measure during the 2021/22 fishing season were *not* considered to contravene CM 31-01 but were treated as consistent with CM 31-01—then CM 31-01 would lose all meaning and effect, as unregulated and unlimited fishing in Subarea 48.3 could occur without

14

consequence. Any Member of the Commission who wished to permit or conduct fishing without restrictions could block consensus on a catch limit or equivalent measure and proceed with fishing as it wished. AR000085. Allowing imports in this circumstance would disregard the Convention's objective to conserve Antarctic marine living resources and undermine the Commission's consensus-based decision-making. AR000054.

At the Fortieth Meeting of the Commission, the Commission failed to reach consensus on a necessary catch limit or equivalent measure for the toothfish fishery in Subarea 48.3 for the 2021/22 fishing season. The Fortieth Meeting Report reflects that "[m]ost Members" agreed that the Scientific Committee's advice regarding catch limits for the toothfish fishery in Subarea 48.3 was "based on the best available science." Fortieth Meeting Report ¶ 6.19; *see* AR000084 n.6 (citing Fortieth Meeting Report ¶¶ 6.18–6.22, 6.26–6.32, 6.35). Several Member statements at the Fortieth Meeting reflect an understanding (1) that the lack of consensus on a catch limit blocked or closed the toothfish fishery in Subarea 48.3, (2) that the failure to adopt a catch limit "results in a failure of CM 31-01," and (3) that the science and advice from the Scientific Committee did not support closing the fishery. Fortieth Meeting Report ¶¶ 6.20, 6.22, 6.28, 6.30; *see* AR000084 n.6 (citing Fortieth Meeting Report ¶¶ 6.18–6.22, 6.26–6.32, 6.35); AR000084 n.7 (quoting Fortieth Meeting Report ¶¶ 6.22, 6.28, 6.30). Contrary to Plaintiff's assertions in a letter to NMFS that the non-adoption of a catch limit for the toothfish Subarea 48.3 suggests that CCAMLR concluded such a catch limit was unnecessary for conservation of the fishery, *see* AR000064 (Letter from E. Comstock and D. Bond to S. Rauch III), these passages from the Fortieth Meeting Report show those assertions to be entirely unsubstantiated. AR000084. Indeed, the Fortieth Meeting Report underscores that the catch limits for the toothfish fishery in Subarea 48.3 in the proposed CM 41-02 were supported by Scientific Committee advice—implying that the catch limits were necessary for the conservation of toothfish in the fishery—and that the failure to adopt catch limits meant that harvesting of toothfish in Subarea 48.3 could not proceed without contravening CM 31-01. *Id.*

### B. Denying Plaintiff's request to import toothfish harvested in contravention of CM 31-01 fulfills U.S. legal obligations under the Convention.

NMFS's determination that toothfish harvest from Subarea 48.3 in the absence of a necessary catch limit for the toothfish fishery in Subarea 48.3 contravenes CM 31-01 should be upheld because it complies with U.S. legal obligations under the Convention.

Under Article IX of the Convention, to give effect to the Convention's conservation objective and principles, the Commission must "formulate, adopt and revise conservation measures on the basis of the best scientific evidence available." CAMLR Convention, Art. IX(1)(f). These conservation measures include catch limits. *Id.*, Art. IX(2)(a), (c). And although the Convention defines conservation to include "rational use" of Antarctic marine living resources, *id.*, Art. II(2), it also requires that any harvest of such resources prevent "decrease in the size of any harvested population to levels below those which ensure its stable recruitment." *Id.*, Art. II(3).

As a Contracting Party to the Convention, the United States must uphold and take appropriate measures within its authority to ensure compliance with the Convention and conservation measures adopted by consensus of the Commission that are binding on it. *Id.*, Arts. IX(6), XXI(1); *see also* 16 U.S.C. § 2434(a) (implementing Article IX(6) process to prevent a CCAMLR conservation measure from becoming binding on the United States in U.S. domestic law). In enacting AMLRCA, Congress found that the Convention "establishes international mechanisms and creates legal obligations necessary for the protection and conservation of Antarctic marine living resources." 16 U.S.C. § 2431(a)(1). And in line with these legal obligations, AMLRCA prohibits importing "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure in force with respect to the United States pursuant to [A]rticle IX of the Convention[.]" *Id.* § 2435(3). The regulations at 50 C.F.R. § 300.105(h)(2) barring NMFS from issuing a preapproval for any shipment of toothfish harvested in contravention of any CCAMLR conservation measure in force at the time of harvest further implement this legal obligation.

CM 31-01's requirement to set necessary catch limits or equivalent measures in Subarea 48.3 is part of the Convention's—and AMLRCA's—legally binding conservation scheme for the conservation of Antarctic marine living resources. A conclusion that toothfish harvest in Subarea 48.3 in the absence of a necessary catch limit or equivalent measure complies with CM 31-01 would conflict with this scientific and precautionary approach to conserving Antarctic marine living resources. NMFS's denial of Plaintiff's preapproval application was required by AMLRCA's regulations and is consistent with both U.S. obligations under the Convention and Congress's intent in passing AMLRCA.

**C.**     **Approving Plaintiff's request to import toothfish harvested in contravention of CM 31-01 would destabilize the Convention's consensus-based structure for cooperative and collective action.**

Requiring NMFS to approve Plaintiff's application for preapproval and thus accept harvesting of toothfish in Subarea 48.3 as compliant with CM 31-01 would undermine the consensus-based decision-making structure of CCAMLR.

As explained above, under Article XII, conservation measures, including catch limits, are adopted by consensus of the Members. CAMLR Convention, Art. XII(1). And once the Commission has adopted a conservation measure, a Contracting Party that wishes not to be bound by that measure must follow the notification procedures under Article IX. *Id.*, Art. IX(6); *see also* 16 U.S.C. § 2434(a). After a measure becomes binding, as is the case for CM 31-01, the United States and other bound Contracting Parties must implement and enforce it. *See, e.g.*, 16 U.S.C. § 2435(3). This mutual respect among Contracting Parties preserves the integrity of the Convention's decision-making procedures and thus enables the Commission to give effect to its objective and principles set out in Article II.

Overturning NMFS's decision to deny Plaintiff's request to import toothfish would damage those decision-making procedures by offering Members an unintended means of escape from regulation, with potentially dire consequences for the conservation of Antarctic marine living resources. If the harvest of toothfish from Subarea 48.3 in the absence of a necessary catch limit complied with CM 31-01, "a Member wishing to fish without restrictions could do so just by blocking consensus on the adoption" of a necessary catch limit or equivalent measure. AR000085. This result would allow Members to escape the binding nature of CM 31-01 without having gone through the required notification process under Article IX, which aims to maintain the Commission's ability to address any potential disagreements pertaining to its conservation measures before they are binding. Creating such a loophole would destabilize the consensus-based decision-making process laid out in the Convention and impair the Commission's ability to adopt conservation measures to carry out the Convention's objective to conserve Antarctic living marine resources. Accordingly, "U.S. acceptance of this fish would have serious implications for the operation of CCAMLR." AR000054.

In sum, to invalidate NMFS's denial would weaken the Convention's decision-making framework and thereby undercut the Convention's objective.

III.    **NMFS addressed counterarguments and fully explained why harvesting toothfish from Subarea 48.3 in the absence of a seasonal catch limit for that toothfish fishery does not comply with CM 31-01.**

NMFS considered and addressed counterarguments that the toothfish Plaintiff sought to import was harvested in accordance with CM 31-01 even without a necessary catch limit for the toothfish fishery in Subarea 48.3. For the reasons NMFS provided, none of these arguments is persuasive.

First, a Contracting Party's compliance with other CCAMLR conservation measures or with unilaterally imposed catch limits does not undermine NMFS's determination that Plaintiff's toothfish shipment was harvested in contravention of CM 31-01. "Even if the United Kingdom has unilaterally imposed comparable measures to those included in CM 41-02 in prior seasons, that is irrelevant to the question of whether prosecution of this fishery in the absence of a measure adopted by CCAMLR contravenes CM 31-01." AR000084. AMLRCA's implementing regulations regarding imports of frozen toothfish shipments required NMFS to determine whether the harvest activities were *in contravention of* any CCAMLR conservation measure in force at the time of harvest, not whether the harvest activities *complied with* any CCAMLR conservation measure or with catch limits unilaterally imposed by a Contracting Party. *See* 50 C.F.R. § 300.105(d); *id.* § 300.105(h)(2).

Second, even though "directed fishing for toothfish in Subarea 48.3 is not prohibited by CM 32-02," the absence of a catch limit for toothfish in Subarea 48.3 does not mean that "the fishery is open without catch limits." AR000085. CM 32-02, which has been in force and unchanged since 2017 (years before the lapse of CM 41-02 containing a catch limit for the toothfish fishery in Subarea 48.3), *id.*, consolidates into a single conservation measure areas and fisheries for which the Commission has adopted prohibitions on directed fishing. *See* CM 32-02 (2017). That the Commission has not adopted such a measure for the toothfish fishery in Subarea 48.3 means only that there is no explicit prohibition on directed fishing for toothfish in Subarea 48.3. The lack of such a prohibition does not address whether harvesting of toothfish in Subarea 48.3 can comply with CM 31-01 without necessary catch limits required by that measure. Moreover, "CCAMLR has adopted specific prohibitions on directed fishing or zero catch limits for certain portions of Subarea 48.3 since 2004, including each year since the adoption of CM 32-02, until [2021]." AR000085. Because "CM 31-01 applies to the entirety of Subarea 48.3," if the absence of a catch limit meant that toothfish harvest in Subarea 48.3 complied with CM 31-

01, then these portions of Subarea 48.3 "would also be open to harvest, a result that would be inconsistent with the Convention's conservation objective." *Id.* In short, CM 31-01 and CM 32-02 should be read in harmony rather than in conflict.

Nor does the harvest of toothfish from Subarea 48.3 absent a catch limit between the adoption of CM 31-01 in 1986 and the adoption of CM 24/IX in 1990 mean that the harvest of toothfish from Subarea 48.3 absent a catch limit in 2022 complies with CM 31-01. *Id.* To begin, while there has been an assertion that the United States imported toothfish from Subarea 48.3 during that time period, *see* AR000051 (Letter from H. Koh to M. Bernstein), nothing in the record supports that assertion or suggests that NMFS had any opportunity to address the issue raised here between 1987 (when the Commission decided to set any necessary catch limit or equivalent measure for the 1987/88 fishing season) and 1990. NMFS's first regulations to implement AMLRCA and CCAMLR conservation measures in force with respect to the United States were promulgated in 1989. *See* 54 Fed. Reg. 6407 (Feb. 10, 1989). These regulations implemented the prohibition on imports of Antarctic marine living resources harvested in violation of any CCAMLR conservation measure in force with respect to the United States. At the time, there was no CDS to monitor harvest throughout the trade cycle; the Commission did not adopt that procedure until nearly a decade later, in 1999. *See* CM 170/XVIII (1999). And NMFS did not promulgate CDS implementing regulations until 2000. *See* 65 Fed. Reg. 30014 (May 10, 2000). Most importantly, the argument that toothfish harvested in Subarea 48.3 after 2021 should be treated the same as toothfish harvested there between 1987 and 1990 ignores a critical difference between these two time periods—from 1987 to 1990, any toothfish harvest in Subarea 48.3 occurred in the absence of a catch limit *before any catch limit for the fishery had ever been adopted by CCAMLR*, whereas from 2021 onward, any toothfish harvest in Subarea 48.3 occurred in the absence of a catch limit *after CCAMLR adopted catch limits for the fishery for three decades without interruption*. AR000084 ("[T]he Commission has adopted an ever-increasing suite of catch limits and other measures for [Subarea 48.3] each year from 1990 until last year, when Russia blocked consensus to adopt proposed CM 41-02."); *see also* AR000084–85 ("A conclusion that fishing could proceed in the absence of a measure would also be inconsistent with decades of CCAMLR practice."); AR000085 (noting that "the adoption of increasingly sophisticated fishery-specific measures has been consistent across CCAMLR fisheries" and that "fisheries have not been prosecuted in the absence of applicable fishery-

19

specific measures authorizing and proscribing the conditions of harvest since the earliest years of the Commission when the management regime was still being established"). In any event, NMFS's silence or lack of a decision denying toothfish imports into the United States between 1987 and 1990 does not imply that NMFS acquiesced in toothfish harvesting in Subarea 48.3 without catch limits during that time. And it certainly does not invalidate NMFS's 2022 decision to deny Plaintiff's application for a preapproval certificate to import a shipment of toothfish harvested that year.

Finally, as explained above, although Plaintiff argued in its letter to NMFS that the Commission's failure to reach consensus on a catch limit for the toothfish fishery in Subarea 48.3 means that the Commission concluded no catch limits or other measures were necessary, *see* AR000064, nothing in the record suggests that the Commission reached any such decision. AR000084. ("There is no basis for concluding that CCAMLR's failure to adopt CM 41-02 represents a decision by CCAMLR that catch limits and other measures for Subarea 48.3 were unnecessary for the current season and, therefore, the fishery could proceed in the absence of such measures without contravening CM 31-01.") To the contrary, the record reflects only views that a catch limit for the toothfish fishery *was* necessary. The Commission discussed the catch limits in the proposed CM 41-02 at the Fortieth Meeting and failed to reach consensus on a catch limit for the toothfish fishery not because of disagreement about whether a catch limit was *necessary* but because of disagreement about the *level* at which the catch limit should be set. *Id.* ("Nor was such a conclusion [that CCAMLR decided a catch limit was unnecessary] supported by the discussions that were held in the Commission."); *id.* n.6; *id.* n.7.

NMFS appropriately considered and addressed the counterarguments above in its Denial Letter. Plaintiff's dissatisfaction with NMFS's application of AMLRCA and its implementing regulations does not render NMFS's reasoned decision-making arbitrary and capricious.

## CONCLUSION

For the above reasons, Defendants respectfully request that the Court grant their motion for summary judgment and find that Plaintiff has no right to any relief.

Dated: June 10, 2024

Respectfully submitted,

TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
MEREDITH L. FLAX, Deputy Section Chief

*/s/ Astrid Stuth Cevallos*
ASTRID STUTH CEVALLOS, Trial Attorney
FREDERICK H. TURNER, Senior Trial Attorney
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Phone:      (202) 307-5751 (Cevallos)
                 (202) 305-0641 (Turner)
Fax:          (202) 305-0275
Email:      Astrid.Cevallos@usdoj.gov
                 Frederick.Turner@usdoj.gov

*Counsel for Defendants*