**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-60040-LEIBOWITZ

Southern Cross Seafoods, LLC,

Plaintiff,

v.

United States of America, *et al*.,

Defendants.

**BRIEF OF *AMICUS CURIAE***
**ANTARCTIC AND SOUTHERN OCEAN COALITION**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANTS UNITED STATES OF AMERICA AND**
**NATIONAL MARINE FISHERIES SERVICE**

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST OF *AMICUS CURIAE* .................. 1

ARGUMENT ........................................................................................................ 3

I. Interpreting CM 31-01 to Prohibit Fishing in Subarea 48.3 in the Absence of a CCAMLR Adopted Catch Limit Gives Effect to the Objectives of the CAMLR Convention and CM 31-01 ........................................................................ 3

*A.* *The CAMLR Convention* ........................................................................ 3

*B.* *CM 31-01* ................................................................................................ 6

II. Other Contracting Parties to the CAMLR Convention Agree that CM 31-01 Prohibits Fishing in Subarea 48.3 in the Absence of a CCAMLR-Adopted Catch Limit ............................................................................................................. 9

III. Requiring the United States to Allow Importation of Fish Caught in Subarea 48.3 Would Cause the United States to Violate Its Treaty Obligation under the CAMLR Convention ........................................................................... 12

CONCLUSION ................................................................................................... 13

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Abbott*, 560 U.S. 1 (2010) ........ 10

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 34 F.4th 1290 (11th Cir. 2022) ........ 7

*In re Korean Air Lines Disaster*, 829 F.2d 1171 (D.C. Cir. 1987) ........ 13

*Medellin v. Texas*, 552 U.S. 491 (2008) ........ 9

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) ........ 13

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ........ 9

*United States v. Stuart*, 489 U.S. 353 (1989) ........ 12

*Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017) ........ 10

### Statutes

Antarctic Marine Living Resources Convention Act of 1984, 16 U.S.C. §§ 2431 *et seq.* ........ 1

### Regulations

50 CFR § 300.105 ........ 13

### Treaties

1964 Agreed Measures for the Conservation of Antarctic Fauna and Flora, *Recommendations adopted at the Third Consultative Meeting, done at Brussels June 2-13, 1964,* June 2, 1964 ... 4

Antarctic Treaty, Dec. 1, 1959, 402 U.N.T.S. 71 ........ 4

Convention on the Conservation of Antarctic Marine Living Resources, May 7, 1980, 1329 U.N.T.S. 47 ........ passim

Convention for the Conservation of Antarctic Seals, June 1, 1972, 1080 U.N.T.S. 175 ........ 4

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ........ 7, 12

### International Cases

*Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal*, Advisory Opinion, 1973 I.C.J. Rep. 166 (July 12) ........ 6

*Responsibilities and Obligations of States with Respect to Activities in the Area*, Case No. 17, Advisory Opinion of Feb. 1, 2011, ITLOS Rep. 2011 ........ 7

**International Regulations**

Antarctic Treaty Consultative Meeting Recommendation VIII-10 (1975), https://tinyurl.com/VIII-10 ........ 4

Antarctic Treaty Consultative Meeting Recommendation IX-2 (1977), https://tinyurl.com/ATCM-IX-2 ........ 4

CCAMLR Secretariat, Conservation Measure 31-01 (1986), https://tinyurl.com/CM-3101-1986 ........ 2, 8

CCAMLR Secretariat, Conservation Measure 8/VI (1987), https://tinyurl.com/yehtw3dp ........ 8

CCAMLR Secretariat, Conservation Measure 10/VI (1987), https://tinyurl.com/2j6u4dpf ........ 8

CCAMLR Secretariat, Conservation Measure 24/IX (1990), https://tinyurl.com/yc8neud6 ........ 8

**Other Authorities**

*Final Act of the Conference on the Conservation of Antarctic Marine Living Resources* (1980), https://tinyurl.com/CAMLRFinalAct ........ 4, 5

CCAMLR Secretariat, *Report of the Eighth Meeting of the Commission* (1989), https://tinyurl.com/4w8bnz57 ........ 8

CCAMLR Secretariat, *Report of the Eighth Meeting of the Scientific Committee* (1989), https://tinyurl.com/SC-CAMLR-VIII ........ 8

CCAMLR Secretariat, *Report of the Fifth Meeting of the Commission* (1986), https://tinyurl.com/CCAMLR-V ........ 8

CCAMLR Secretariat, *Report of the Fortieth Meeting of the Commission*, https://tinyurl.com/38z76fzn ........ 10

CCAMLR Secretariat, *Report of the Forty-First Meeting of the Commission*, https://tinyurl.com/y59bezn2 ........ 11

CCAMLR Secretariat, *Report of the Forty-Second Meeting of the Commission*, https://tinyurl.com/yjnazshd ........ 10, 11, 12

CCAMLR Secretariat, *Report of the Fourth Meeting of the Scientific Committee* (1985), https://tinyurl.com/SC-CAMLR-IV ........ 8

CCAMLR Secretariat, *Report of the Ninth Meeting of the Commission* (1990), https://tinyurl.com/CCAMLR-IX ........ 8

CCAMLR Secretariat, *Report of the Third Meeting of the Commission* (1984), https://tinyurl.com/CCAMLR-III ........ 7

CCAMLR Secretariat, *Report of the Third Meeting of the Scientific Committee* (1984), https://tinyurl.com/SC-CAMLR-III ........ 7

CCAMLR Secretariat, *Statistical Bulletin*, Vol. 4 (1982-1991) (1992), https://tinyurl.com/mryzk2ap ..................................................................................................... 12

Silja Vöneky & Sange Addison-Agyei, *Antarctica*, MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (2019), https://tinyurl.com/MPEPIL-Antarctica ..................................... 3

## INTRODUCTION AND STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Antarctic and Southern Ocean Coalition ("ASOC") is a coalition of non-governmental organizations concerned with the environmental protection of Antarctica and the surrounding Southern Ocean. ASOC's founding members participated in the negotiation and elaboration of the Convention on the Conservation of Antarctic Marine Living Resources, May 7, 1980, 1329 U.N.T.S. 47 (the "CAMLR Convention" or the "Convention"). Since 1988, ASOC has been designated as a formal observer to the Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR" or the "Commission"), which is the international regulatory body established under the Convention with responsibility for adopting binding conservations measures that govern fishing in the Southern Ocean.

In this action, Plaintiff Southern Cross Seafoods, LLC challenges the decision of the National Marine Fisheries Service ("NMFS") to deny Plaintiff's application for a pre-approval certificate to import Patagonian toothfish (*D. eleginoides*). NMFS was right to do so. The fish that Plaintiff sought to import were harvested in an area of the Southern Ocean—known as Subarea 48.3—in contravention of a binding conservation measure, known as Conservation Measure 31-01 ("CM 31-01"), that had been duly adopted by CCAMLR. D.E. 6 ¶ 1. As such, the United States was required by its international treaty obligations to refuse Plaintiff's request.[1] *See* CAMLR Convention, art. XXI(1).

Specifically, CCAMLR adopted CM-31-01 in 1986. It provides in relevant part:

> … for species upon which fisheries are permitted around South Georgia (Statistical Subarea 48.3), the Commission shall, at its 1987 Meeting, adopt limitations on catch, or equivalent measures, binding for the 1987/88 season.

---

[1] Those international legal obligations are given domestic effect through the Antarctic Marine Living Resources Convention Act of 1984, 16 U.S.C. §§ 2431 *et seq.*, and its implementing regulations.

> Such limitations of catch or equivalent measures shall be based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia.
>
> For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season.

CM 31-01, https://tinyurl.com/CM-3101-1986.

      CCAMLR did not adopt a catch limit or equivalent measure for Patagonian toothfish in Subarea 48.3 for the 2021/22 fishing season.  The effect was to close the subarea to fishing.  As the NMFS explained when denying the importation certificate: "In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for th[at] season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures."  D.E. 6 at 22.

      In challenging the NMFS's decision, Plaintiff contends that the absence of a CCAMLR-adopted catch limit opened Subarea 48-3 to unlimited fishing.  *See* D.E. 73 at 12.  This turns the CAMLR Convention's conservation regime on its head.  As detailed below, the Contracting Parties to the Convention concluded that treaty for the specific purpose of promoting marine conservation.  This entails preventing overfishing of the Southern Ocean's vulnerable fish stocks by means of scientifically-informed catch limits or equivalent measures that CCAMLR adopts by consensus.  That overarching objective is given effect in Subarea 48.3 through CM 31-01.  Plaintiff's wrongheaded view that CM 31-01 somehow authorizes unlimited fishing when CCAMLR does not adopt a catch limit is antithetical to the text and objectives of the CAMLR Convention generally and of CM 31-01 in particular.

      If accepted, Plaintiff's interpretation would do serious damage to the functioning of the Convention's carefully drawn environmental protection regime.  For that reason, many of the Convention's Contracting Parties have gone on record as agreeing with the United States that the

absence of a catch limit for Subarea 48-3 means that it is closed to fishing. These include the European Union, Russian Federation, People's Republic of China, Argentine Republic, and Uruguay. As parties to the CAMLR Convention, the Court must give their views—and the views of the United States—considerable weight. Indeed, requiring the United States to allow the importation of toothfish harvested in violation of CM-31-01, as Plaintiff asks this Court to order, would cause the United States to breach its international treaty obligations. The Court should issue no such order but instead grant summary judgment in favor of Defendants.

## ARGUMENT

### I. Interpreting CM 31-01 to Prohibit Fishing in Subarea 48.3 in the Absence of a CCAMLR-Adopted Catch Limit Gives Effect to the Objectives of the CAMLR Convention and CM 31-01.

#### *A. The CAMLR Convention*

The CAMLR Convention is an environmental conservation treaty. Fundamentally, its objective is to conserve Antarctica's vulnerable marine resources. In that connection, the CAMLR Convention is an integral part of the Antarctic Treaty System, which is a set of international "agreements made … to co-ordinate activities and relations on the Antarctic continent." Silja Vöneky & Sange Addison-Agyei, *Antarctica*, MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (2019), ¶ 12, https://tinyurl.com/MPEPIL-Antarctica. That system is based on specific objectives, including "the protection of the Antarctic environment." *Id.*, ¶ 13. Environmental conservation thus lies at the core of the system. Its foundational treaty, the Antarctic Treaty, requires its parties to adopt, *inter alia*, "measures regarding … the preservation and conservation of living resources in Antarctica." Antarctic Treaty, Dec. 1, 1959, 402 U.N.T.S. 71, art. IX(1)(f).

Acting on this obligation, in 1975, the 12 original parties to the Antarctic Treaty recommended the adoption of "effective measures for the conservation of Antarctic marine living

resources." Antarctic Treaty Consultative Meeting ("ATCM") Recommendation VIII-10 (1975), ¶ 3, https://tinyurl.com/VIII-10. Those measures were urgently required. In 1977, the parties agreed that a "definitive regime for the Conservation of Antarctic Marine Living Resources should be concluded before the end of 1978." ATCM Recommendation IX-2 (1977), ¶ III(1), https://tinyurl.com/ATCM-IX-2.[2] And they resolved that this "regime should explicitly recognize" their "prime responsibilities" in regard to "the protection and conservation of the environment in the Antarctic Treaty area." *Id.*, ¶ III(3)(a).

The parties adopted the final text of the CAMLR Convention at the May 1980 Conference on the Conservation of Antarctic Marine Living Resources. The Conference's Final Act described the Convention as "a definitive regime for the conservation of Antarctic marine living resources." *Final Act of the Conference on the Conservation of Antarctic Marine Living Resources* (1980), § II, https://tinyurl.com/CAMLRFinalAct. It urged the Convention's signatories to "take all possible steps" to bring the treaty "into force as soon as possible" in view of the recognition that "harvesting of Antarctic marine living resources [wa]s presently taking place" and of "the urgent importance" of achieving the Convention's conservation objective. *Id.*

The Convention's drafters prepared its text against the backdrop of significant concerns about overfishing in Antarctic waters. At the time, there was "intense fishing" in the Southern Ocean that had caused species in some areas to be "severely overfished." CCAMLR, *History*, https://www.ccamlr.org/en/organisation/fishing-ccamlr (last visited Aug. 8, 2024). Heightening

[2] The parties had earlier adopted measures for the protection of other aspects of Antarctic wildlife. *See* 1964 Agreed Measures for the Conservation of Antarctic Fauna and Flora, *Recommendations adopted at the Third Consultative Meeting, done at Brussels June 2-13, 1964*, June 2, 1964, https://tinyurl.com/1964Measures, to protect native mammals and birds on the Antarctic continent, and the Convention for the Conservation of Antarctic Seals to protect seals in the Southern Ocean, Convention for the Conservation of Antarctic Seals, June 1, 1972, 1080 U.N.T.S. 175.

the need to protect vulnerable Antarctic fish stocks, the Soviet Union had begun exploiting Antarctic krill. This gave rise to "concerns" regarding the "serious effect" that over-exploitation of the krill fisheries could have on the birds, seals and fish that "mainly depend on krill for food." British Antarctic Survey, *The Convention on the Conservation of Antarctic Marine Living Resources*, https://tinyurl.com/yp7cxhxy/.

To accomplish the parties' objective of conserving Antarctica's marine resources, the CAMLR Convention mandates that all Antarctic fishing must be carried out in accordance with conservation principles and subject to CCAMLR regulations. These include, first and foremost, catch limits. To that end, the Convention provides that insofar as "*[a]ny* harvesting and associated activities" occur, they "*shall* be conducted in accordance" with three enumerated "principles of conservation." CAMLR Convention, art. II(3) (emphases added). Those principles are:

> (a) Prevention of decrease in the size of any harvested population to levels below those which ensure its stable recruitment;
>
> (b) Maintenance of the ecological relationships between harvested, dependent and related populations of Antarctic marine living resources and the restoration of depleted populations; and
>
> (c) Prevention of changes or minimization of the risk of changes in the marine ecosystem which are not potentially reversible over two or three decades.

*Id*. The word "shall" as used in Article II is an imperative command. *See, e.g., Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal*, Advisory Opinion, 1973 I.C.J. Rep. 166, ¶ 77 (July 12). As such, it requires that "any," that is, *all*, "harvesting" of fish in the Convention area, *must* be carried out pursuant to those conservation principles.

The CAMLR Convention assigns to CCAMLR responsibility for exercising regulatory authority in the waters covered by the Convention. Specifically, under Article IX(1), the Commission is empowered to "formulate, adopt and revise conservation measures" that "give

effect" to the Convention's conservation principles. CAMLR Convention, art. IX(1).[3] Thus, a CCAMLR-adopted conservation measure cannot be interpreted in a manner that is inconsistent with these principles. As the United States correctly observes, "the Commission's mandate to regulate harvesting elaborated in the terms of Article IX(2), taken together with the conservation principles in Article II(3), reinforce the conclusion that harvesting is permissible *only* where it does not impede conservation." D.E. 79 at 11 (emphasis added).

The Convention underscores the central role contemplated for catch limits in conserving the Southern Ocean's fish stocks. *See* CAMLR Convention, art. IX(2)(a) (referring to "[t]he designation of the quantity of any species which may be harvested); *id*. art IX(2)(c) (referring to "[t]he designation of the quantity which may be harvested from the populations of regions and sub-regions"). Conservation measures governing fishing activities must be adopted by the Commission through consensus, *id*., art. XII(1), after "tak[ing] full account of the recommendations and advice of the Scientific Committee," *id*., art. IX(4).[4]

*B. CM 31-01*

CM 31-01 requires catch limits or equivalent measures to be in force for fishing to be allowed in Subarea 48.3. It thus promotes the principles that must be given effect through CCAMLR's adoption of conservation measures.[5]

---

[3] CCAMLR's membership is comprised of the Convention's original Contracting Parties as well as States Parties to the Convention that are "engaged in research or harvesting activities," as well as "regional economic integration organization[s] [that] ha[ve] acceded to th[e] Convention." CAMLR Convention, art. VII(2).

[4] The Scientific Committee is a "consultative body to the Commission" comprised of individuals appointed by each member of CCAMLR, who must possess "suitable scientific qualifications [and] who may be accompanied by other experts and advisers." CAMLR Convention, art. XIV(1)-(2).

[5] As an international legal instrument, CM 31-01 must be construed consistently with the terms and objectives of the CAMLR Convention. *See* Vienna Convention on the Law of Treaties ("VCLT"), May 23, 1969, 1155 U.N.T.S. 331, art. 31(1) ("A treaty shall be interpreted in good

The circumstances of CCAMLR's adoption of CM 31-01 reinforce the conclusion that it does not permit fishing in the absence of a CCAMLR-adopted catch limit. In that connection, CM 31-01 was motivated by acute concerns about overfishing in Subarea 48.3. In 1984, the Commission's Scientific Committee reported that Patagonian toothfish in Subarea 48.3 were "being heavily fished and in need of conservation measures." CCAMLR Secretariat, *Report of the Third Meeting of the Scientific Committee* (1984), ¶ 7.9, https://tinyurl.com/SC-CAMLR-III. This caused CCAMLR to recognize "an urgent need for conservation measures for the fish stocks around South Georgia," *i.e.*, Subarea 48.3. CCAMLR Secretariat, *Report of the Third Meeting of the Commission* (1984), ¶ 37, https://tinyurl.com/CCAMLR-III. Indeed, Patagonian toothfish overfishing was considered to be so serious that, in 1985, many members of CCAMLR's Scientific Committee supported closing Subarea 48.3 to commercial fishing entirely, so as to allow data to be collected that would permit CCAMLR to properly manage commercial fishing. *See* CCAMLR Secretariat, *Report of the Fourth Meeting of the Scientific Committee* (1985), ¶¶ 4.37-4.49, https://tinyurl.com/SC-CAMLR-IV.

The following year, CCAMLR addressed these concerns by adopting CM 31-01. CCAMLR determined that, beginning with the 1987/88 fishing season, all fisheries in the region would be regulated by catch limits or equivalent measures based on data. *See* CM 31-01. CCAMLR expected that the data necessary for it to set those limits would be available. *See* CCAMLR Secretariat, *Report of the Fifth Meeting of the Commission* (1986), ¶¶ 52, 69,

---

faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."); *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 34 F.4th 1290, 1306 n. 5 (11th Cir. 2022) (observing courts "have relied on [the VCLT] when interpreting treaties because it is considered the authoritative guide for their interpretation"); *Responsibilities and Obligations of States with Respect to Activities in the Area*, Case No. 17, Advisory Opinion of Feb. 1, 2011, ITLOS Rep. 2011, 10, ¶ 60 (holding the VCLT's interpretive rules guide the interpretation of international regulatory acts).

https://tinyurl.com/CCAMLR-V. It adopted catch limits the following season for species (*N. rossii*, *C. gunnari*, *N. gibberifrons*, and *N. guntheri*) for which the Commission had sufficient data. *See id.*, ¶¶ 4.43-4.50; CM 8/VI (1987), https://tinyurl.com/yehtw3dp; CM 10/VI (1987), https://tinyurl.com/2j6u4dpf.

In 1989, data revealed a "rapid rise in catch levels" of Patagonian toothfish in Subarea 48.3. CCAMLR Secretariat, *Report of the Eighth Meeting of the Commission* (1989), ¶ 104, https://tinyurl.com/4w8bnz57. This caused CCAMLR and its Scientific Committee to raise the alarm about overfishing. *See id.*; CCAMLR Secretariat, *Report of the Eighth Meeting of the Scientific Committee* (1989), ¶ 3.42, https://tinyurl.com/SC-CAMLR-VIII. At the following year's meeting, CCAMLR reached consensus on a catch limit for Patagonian toothfish, based on the advice of its Scientific Committee. CCAMLR Secretariat, *Report of the Ninth Meeting of the Commission* (1990), ¶¶ 13.27, 13.35-13.37, https://tinyurl.com/CCAMLR-IX; *see also* CM 24/IX (1990), https://tinyurl.com/yc8neud6. Consensus on catch limits was likewise reached each year that followed until 2021. *See* CCAMLR Secretariat, *Fishery Report 2021: Dissostichus eleginoides in Subarea 48.3* (May 27, 2022) at 6, https://tinyurl.com/yk9metvf.

The catch limits imposed by CCAMLR in Subarea 48.3 have served a crucial conservation function. CCAMLR reports that they have ensured that the Patagonian toothfish fishery is "fully sustainably fished … without at any time [having] becom[e] overfished or depleted." CCAMLR Secretariat, *Toothfish – precautionary development of a deep-water fishery* (Oct. 21, 2021), https://tinyurl.com/2azjs8uk. However, this success would almost certainly be reversed if Subarea 48.3 were to be thrown open to unlimited fishing. Yet, that would be the consequence if Plaintiff's distorted interpretation of CM 31-01 were followed. That result is irreconcilable with the

Convention's objectives and the conservation principles to which CM 31-01 is designed to give effect.[6]

## II. Other Contracting Parties to the CAMLR Convention Agree that CM 31-01 Prohibits Fishing in Subarea 48.3 in the Absence of a CCAMLR-Adopted Catch Limit.

The United States interprets CM 31-01 to mean that where, as here, CCAMLR has not adopted a catch limit or equivalent measure, fishing for Patagonian toothfish is prohibited in Subarea 48.3. Its interpretation is entitled to "great weight." *Medellin v. Texas*, 552 U.S. 491, 513 (2008). *See also Swarna v. Al-Awadi*, 622 F.3d 123, 136 (2d Cir. 2010) (noting the "'well established canon of deference' with regard to Executive Branch interpretation of treaties") (internal quotation marks omitted).

That interpretation accords with the views of the many Contacting Parties to the CAMLR Convention who likewise understand CM 31-01 to mean that the absence of a CCAMLR-adopted catch limit or equivalent measure has the effect of closing Subarea 48.3 to fishing. As parties to the Convention, their views entitled to "considerable weight." *Water Splash, Inc. v. Menon*, 581 U.S. 271, 282 (2017) (citing *Abbott v. Abbott*, 560 U.S. 1, 16 (2010)). Indeed, their views on CM-31-01's meaning are especially probative because, despite reflecting a diversity of perspectives

[6] Contrary to Plaintiff's attempt to suggest otherwise, D.E. 82 at 13, the fact that a State Party to the Convention can opt-out of a CCAMLR conservation measure no later than 90 days after its notification does not call into question the United States' interpretation of CM 31-01. The existence of that procedural right says nothing about the substantive content of any particular conservation measure that CCAMLAR has adopted. Moreover, the opt-out mechanism underscores the importance that the Convention places on consensus-based regulation as the means of promoting the Convention's conservation objectives. Once a CCAMLR member "notifies the Commission that it is unable to accept the conservation measure," the Commission meets at the request of any member "to review the conservation measure," CAMLR Convention, art. IX(6)(c)-(d). This enables CCAMLR to take into account any concerns that led to the opt-out and adjust the conservation measure accordingly.

and interests, they are uniform in agreeing that Subarea 48.3 is closed to fishing due to the absence of a CCAMLR catch limit.

For instance, the **European Union** is a member of CCAMLR in its own right and counts among EU Member States no fewer than 11 Contracting Parties to the CAMLR Convention.  At the 2021 CCAMLR meeting, the European Union stated that the consequence of CCAMLR's failure "to agree on catch limits for Patagonian toothfish (*D. eleginoides*) in Subarea 48.3 for the 2021/22 season" is to "clos[e] the fishery." CCAMLR Secretariat, *Report of the Fortieth Meeting of the Commission* ("CCAMLR-40") (2021), ¶ 6.28, https://tinyurl.com/38z76fzn.

The **People's Republic of China** expressed the same view when it set out its "understanding of CCAMLR fisheries management" in Subarea 48.3.  Specifically, China stated that "no catch limits means no fishing." *Id*., ¶ 139.  China thus warned that "vessels participating in a fishery without an agreed catch limit would be conducting IUU [illegal, unreported and unregulated] fishing."  CCAMLR Secretariat, *Report of the Forty-Second Meeting of the Commission* ("CCAMLR-42") (2023), ¶ 4.56, https://tinyurl.com/yjnazshd.

The **Argentine Republic** likewise stated that without a catch limit adopted by CCAMLR there is no "conservation measure" that "would have allowed the operation of the Patagonian toothfish fishery in Subarea 48.3 … as required by CM 31-01." *Id*., ¶ 4.53.  Argentina further stated:

> What enables fishing under the Convention is not the absence of a ban, but the existence of a CCAMLR conservation measure that allows it. This was the approach adopted by CCAMLR since the adoption of CM 31-01 in 1986. Therefore, *if a conservation measure is not adopted, we cannot infer that fishing is then allowed*, since the Commission has not agreed on a catch limit based on the best available science.

CCAMLR Secretariat, *Report of the Forty-First Meeting of the Commission* ("CCAMLR-41") (2022), ¶ 125 (emphasis added), https://tinyurl.com/y59bezn2.

The **Russian Federation** agrees. It observed that since "the *D. eleginoides* fisheries in Statistical Subarea 48.3 are regulated by the Commission (CM 31-01)" and there is no "agreement on the catch limit of the *D. eleginoides* fisheries in Subarea 48.3 for the 2021/22 season," the fact that the applicable catch limit in force for the 2020/21 season, CM 41-02, "was not extended for the 2021/22 season" means that "the [Patagonian] toothfish fishery was closed for 2022." The Russian Federation thus stated that "any toothfish fishery in Subarea 48.3, during the current season … must be identified by CCAMLR as IUU fishing." CCAMLR-41, ¶ 124.

The same interpretation is shared by **Oriental Republic of Uruguay**. It expressed the following understanding of CM 31-01:

> [G]iven the absence of the relevant conservation measure, the vessels in question should not fish in that area [*i.e.*, Subarea 48.3]. Otherwise, what is the purpose of adopting conservation measures? We understand that the principle of 'everything which is not forbidden is allowed' does not apply in this case, and we base that position on the very reason for the existence of the conservation measures, namely, conservation—the very objective of the Convention.

CCAMLR-42, ¶ 148.

States have conformed their fishing practices to the closure of Subarea 48.3. The **Republic of Chile**, which had previously fished in those waters, now desists from doing so. As Argentina reported, in light of the absence of a catch limit adopted by CCAMLR, Chile "advised its industry to abstain from fishing in Subarea 48.3 due to concerns about any activities being considered IUU fishing by CCAMLR." *Id*. at 169. Similarly, Uruguay, which had also previously fished in Subarea 48.3, explained that the "landing of Patagonian toothfish from this subarea" in "Uruguayan ports" had been "prohibited" due to the "lack of adoption" of a CCAMLR catch limit. *Id*.

The practice of these and other States that are forbearing from fishing in Subarea 48.3 provides additional compelling evidence that the United States correctly interprets CM 31-01. *See*

*United States v. Stuart*, 489 U.S. 353, 355 (1989) (observing treaty parties' "conduct generally evinces their understanding of the agreement they signed"); VCLT, art. 31(3)(b) (noting relevance of "[a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation").[7]

**III. Requiring the United States to Allow Importation of Fish Caught in Subarea 48.3 Would Cause the United States to Violate Its Treaty Obligations under the CAMLR Convention.**

If the Court were to require the United States to allow the importation of toothfish harvested in Subarea 48.3 it would cause the United States to violate its obligations under the CAMLR Convention. Article XXI(1) of the Convention requires the Contracting Parties, including the United States, to "take appropriate measures … to ensure compliance … with conservation measures adopted by [CCAMLR] to which the Party is bound in accordance with Article IX of this Convention." CAMLR Convention, art. XXI(1).

The United States has correctly interpreted CM 31-01 to require that, for fish to be harvested legally in Subarea 48.3, there must be a CCAMLR catch limit in place. The NMFS therefore determined that the United States' treaty obligations under Article XXI(1) obligate it to deny Plaintiff's requested pre-approval certificate. As the NMFS explained, the United States determined that its obligations under the Convention preclude the NMFS from "issu[ing] a pre-approval certificate for any shipment '[d]etermined to have been harvested or transshipped in

[7] Plaintiff's observation that "[f]rom 1986 to 1990, no catch limits were adopted, and fishing of toothfish continued in Subarea 48.3," D.E. 73 at 17, does not call into question the correctness of the United States' interpretation of CM 31-01. The vast majority of fishing of toothfish during that period was conducted by the Soviet Union and the Soviet satellite states of Poland and East Germany. *See* CCAMLR Secretariat, *Statistical Bulletin*, Vol. 4 (1982-1991) (1992), Section B, Table 5 at 22-24, https://tinyurl.com/mryzk2ap. The Russian Federation—the Soviet Union's successor—has made clear that it *shares* the United States' interpretation of CM 31-01, *see supra* at 11, and the modern incarnations of Poland and Germany are members of the EU, which also concurs with the United States. *See supra* at 10.

contravention of any CCAMLR Conservation Measure in force at the time of harvest or transshipment.'" D.E. 6 at 23 (quoting 50 CFR § 300.105(h)(2)).

Granting summary judgment in favor of Plaintiff would require the United States to permit the importation of toothfish harvested in contravention of CM 31-01. This would cause the United States to violate its international obligations under the CAMLR Convention. The Court should take no such action. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (holding "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, R.B., J.) (holding it "is especially inappropriate for the Court to interpret … treaty provisions in such a way as to relieve the United States of its treaty obligations"). Instead, the Court should grant Defendants' motion for summary judgment.

**CONCLUSION**

For the foregoing reasons, ASOC respectfully submits that the Court should grant summary judgment in favor of Defendants.

Dated: October 7, 2024          Respectfully submitted,

/s/ Madeleine K. Rodriguez
Andrew B. Loewenstein (*pro hac vice* pending)
Madeleine K. Rodriguez
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Tel: 617-832-1000
Fax: 617-832-7000
aloewenstein@foleyhoag.com
mrodriguez@foleyhoag.com

Nicholas M. Renzler (*pro hac vice* pending)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: 212-812-0400
Fax: 212-812-0399
nrenzler@foleyhoag.com

*Attorneys for* Amicus Curiae
*Antarctic and Southern Ocean Coalition*