## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:24-cv-60040-LEIBOWITZ

**SOUTHERN CROSS SEAFOODS, LLC**,

 *Plaintiff,*

*v.*

**UNITED STATES OF AMERICA**, *et al.,*

 *Defendants.*

_____/

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiff Southern Cross Seafoods, LLC's ("Southern Cross") and Defendants National Marine Fisheries Service ("NMFS") and the United States of America's (collectively, "the United States") cross motions for summary judgment [ECF Nos. 73, 75], both filed on June 10, 2024.  The parties have responded to the cross motions [ECF Nos. 79, 82] and have filed replies [ECF Nos. 84, 86].  The Antarctic and Southern Ocean Coalition filed an *Amicus* Brief in Support of the United States' Motion for Summary Judgment [ECF No. 94], on October 7, 2024, to which both parties responded [ECF Nos. 99, 100].  For the foregoing reasons, Southern Cross's Motion [ECF No. 73] is DENIED, and the United States' Motion [ECF No. 75] is GRANTED.

### BACKGROUND

This matter concerns the United States' denial of Southern Cross's request for a preapproval certificate to import frozen Patagonian toothfish[1] ("toothfish") harvested in the South Atlantic Ocean. The denial was issued before a complex legal and regulatory backdrop.

_____

[1] Patagonian toothfish is more commonly known in the United States as Chilean Sea Bass, although it neither a bass nor commonly caught in Chilean waters.  *See Chilean Sea Bass Frequently Asked Questions,* NOAA, http://media.fisheries.noaa.gov/dam-migration/chilean_sea_bass_fact_sheet.pdf (last visited Jan. 23, 2025) ("NOAA Chilean Sea Bass FAQ").  Rather, an entrepreneur coined the

I.    The Convention on the Conservation of Antarctic Marine Living Resources

The Convention on the Conservation of Antarctic Marine Living Resources ("CCAMLR") is an international treaty signed on May 20, 1980, in Canberra, Australia.[2]  CCAMLR's purpose is to protect Antarctic marine ecosystems.[3]  Currently, CCAMLR has twenty-seven member-states ("the Contracting Parties"), including the United States, and ten acceding states.[4]  The United States signed CCAMLR on September 11, 1980, ratified it on February 18, 1982, and the treaty went into effect on April 7, 1982.[5]  The parties ratified the CCAMLR to "recogni[ze] the importance of safeguarding the environment and protecting the integrity of the ecosystem of the seas surrounding Antarctica[,]"[6] and to "conserv[e][7] . . . Antarctic marine living resources[,]."[8]  Article II of CCAMLR requires that:

---

name in 1977 to market the fish to the American palate.  *See The Invention of the Chilean Sea Bass*, Priceonomics (Apr. 28, 2014) http://priceonomics.com/the-invention-of-the-chilean-sea-bass/ (citing G. Bruce Knecht, Hooked:  A True Story of Pirates, Poaching and the Perfect Fish (2006)).  Although the undersigned's law clerk argues strongly that the Chilean Sea Bass is not delicious, American consumers demand the importation of about 10,000 tons of it annually.  NOAA Chilean Sea Bass FAQ.

[2]    *CAMLR Convention*, CCAMLR, http://www.ccamlr.org/en/organisation/convention (Oct. 23, 2019).

[3]    *Id.*; *see History of the Convention*, CCAMLR, http://www.ccamlr.org/en/organisation/convention-history (Oct. 23, 2019).

[4]    *Membership*, CCAMLR, http://www.ccamlr.org/en/organisation/who-involved-ccamlr (Oct. 20, 2022).

[5]    *Status List:  Convention of the Conservation of Antarctic Marine Living Resources*, AustLII, http://www.austlii.edu.au/au/other/dfat/treaty_list/depository/CCAMLR.html (June 28, 2022).

[6]    Convention on the Conservation of Antarctic Marine Living Resources Preamble, Oct. 20, 1982, http://www.ccamlr.org/en/organisation/convention (last visited Jan. 24, 2025) ("CAMLR Convention").

[7]    CCAMLR specifies that the term "conservation" in the convention includes "rational use." *Id.* art. II(2).

[8]    *Id.* art. II(1).

Any harvesting and associated activities in the area to which this Convention applies shall be conducted in accordance with the provisions of this Convention and with the following principles of conservation:

(a)  prevention of decrease in the size of any harvested population to levels below those which ensure its stable recruitment.  For this purpose its size should not be allowed to fall below a level close to that which ensures the greatest net annual increment;

(b)  maintenance of the ecological relationships between harvested, dependent and related populations of Antarctic marine living resources and the restoration of depleted populations to the levels defined in sub-paragraph (a) above; and

(c)  prevention of changes or minimi[z]ation of the risk of changes in the marine ecosystem which are not potentially reversible over two or three decades, taking into account the state of available knowledge of the direct and indirect impact of harvesting, the effect of the introduction of alien species, the effects of associated activities on the marine ecosystem and of the effects of environmental changes, with the aim of making possible the sustained conservation of Antarctic marine living resources.[9]

CCAMLR established the Commission for the Conservation of Antarctic Marine Living Resources ("the Commission") to "formulate, adopt and revise conservation measures on the basis of the best scientific evidence available[,]" including the designation of the quantity of fish which may be harvested in a covered area.[10]   Substantive decisions by the Commission can only be made by consensus of all Members.[11]

---

[9]      *Id.* art. II(3).

[10]     *Id.* arts. VII, IX(1)(f), (2)(c).

[11]     *See id.* art. XII(1).

CCAMLR applies to the following area in the waters surrounding Antarctica:[12]



At issue here is Southern Cross's attempt to import toothfish harvested in Subarea 48.3, marked in the map above with an orange circle, which includes the waters surrounding South Georgia, a British Overseas Territory. [Southern Cross's Statement of Material Facts, ECF No. 74 ¶ 16; United States' Statement of Material Facts, ECF No. 78 ¶ 5].

---

[12]    *Convention        Area        Statistical        Areas,*        CCAMLR, http://www.ccamlr.org/en/system/files/CCAMLR-Convention-Area-Map.pdf (last visited Jan. 27, 2025) ("Convention Area Map").

In 1984, Congress enacted the Antarctic Marine Living Resources Convention Act ("AMLRCA"), 16 U.S.C. § 2431, *et seq.*, through which the United States implements CCAMLR. [Southern Cross's Statement of Material Facts ¶ 33].  In enacting AMLRCA, Congress found that CCAMLR established "international mechanisms and creates legal obligations necessary for the protection and conservation of Antarctic marine living resources[,]" sets out "standards designed to ensure the health of the individual populations and species and to maintain the health of the Antarctic marine ecosystem as a whole[,]" and "represents an important contribution to United States long term legal and political objectives of maintenance of Antarctica as an area of peaceful international cooperation[.]"  16 U.S.C. § 2431(a)(1)–(2), (4).  Under AMLRCA, the United States may not import "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure" adopted by the Commission.  *Id.* § 2435(3).

To effectuate AMLRCA, Congress required the Secretary of Commerce to promulgate all necessary and appropriate regulations to implement the statute.  *Id.* § 2436(a).  A United States Department of Commerce regulation requires the United States to issue a preapproval certificate to authorize the importation of all shipments of frozen toothfish to ensure that the importation application meets the requirements of AMLRCA, including that the toothfish was not harvested in violation of any CCAMLR conservation measure.  50 C.F.R. § 300.105(a), (d), (h)(1).

II.   <u>Toothfish Catch Limits</u>

In 1986, pursuant to its authority vested by CCAMLR, the Commission adopted the first conservation measure regarding toothfish in Subarea 48.3, now known as CM 31-01:

> Without prejudice to other conservation measures adopted by the Commission, for species upon which fisheries are permitted around South Georgia (Statistical Subarea 48.3), the Commission shall, at its 1987 Meeting, adopt limitations on catch, or equivalent measures, binding for the 1987/88 season.

> Such limitations of catch or equivalent measures shall be based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia.

> For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season.

[United States' Statement of Material Facts ¶ 7]. Prior to the Commission's adoption of CM 31-01, there were no toothfish catch limits and fishing vessels regularly fished toothfish in Subarea 48.3. [Southern Cross's Statement of Material Facts ¶¶ 17, 18, 20]. This authorization for the Commission to set catch limits was adopted, in part, based on a concern of the overfishing of toothfish in Subarea 48.3. [*See* United States' Statement of Additional Facts, ECF No. 80 ¶¶ 60–61].[13] From 1990 until 2021, the Commission, by consensus, adopted catch limits under Conservation Measure 41-02 ("CM 41-02") for toothfish in Subarea 48.3. [Southern Cross's Statement of Material Facts ¶¶ 21–23; United States' Statement of Material Facts ¶¶ 8, 10].

However, in October 2021, the Commission failed to reach consensus on a conservation measure to set catch limits for toothfish in Subarea 48.3 for the 2021/2022 fishing season, despite a proposed catch limit that most member countries noted was based on the "best available science." [United States' Statement of Material Facts ¶¶ 15–16].[14] The United States, United Kingdom, and European Union all supported the adoption of a catch limit in Subarea 48.3, and the United States expressly recognized that there was no scientific basis for closing the toothfish fishery.[15] [*Id.* ¶¶ 18–20; Southern Cross's Statement of Material Facts ¶ 31].

---

[13]     *See also* CCAMLR Secretariat, Report of the Third Meeting of the Scientific Committee ¶ 7.9–7.10 (1984), http://meetings.ccamlr.org/system/files/e-sc-iii.pdf (identifying toothfish as "being heavily fished and in need of conservation measures[.]").

[14]     The Commission was unable to reach consensus on a catch limit on toothfish for the 2021/2022 fishing season because Russia blocked the agreement shortly before its invasion of Ukraine. [*See* United States Statement of Material Facts ¶ 18].

[15]     When no catch limit was established in 2021, CCAMLR members made statements indicating that they understood the failure to establish a catch limit prevented fishing in Subarea 48.3 entirely. [*See* United States' Statement of Material Facts ¶¶ 18 ("The United Kingdom stated that . . . [the failure

III.    <u>The United States' Denial of Southern Cross's Application</u>

In August 2022, the United States received an application from Southern Cross, an American toothfish importer, for a preapproval certificate to import frozen toothfish harvested in Subarea 48.3 in June and July 2022.[16]   [United States' Statement of Material Facts ¶¶ 21–22; Southern Cross's Statement of Material Facts ¶¶ 39–40].   While there is no dispute that Southern Cross's application met the regulatory requirements of a preapproval certificate application, [*see* Southern Cross's Statement of Material Facts ¶ 54], the United States denied Southern Cross's preapproval application in September 2022 ("the Denial Letter"), stating that the failure of the Commission to adopt a conservation measure for the 2021/2022 fishing season effectively prohibited all toothfish harvesting in Subarea 48.3.   [*See* Denial Letter, ECF No. 73-1 at 88–91 ("In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures.")].   The Denial Letter explained that allowing fishing in the absence of a conservation measure would be inconsistent with decades of CCAMLR practice and would be inconsistent with CCAMLR's conservation objective, as it would allow any Member country wishing to fish without any restriction to do so just by blocking consensus on the adoption of applicable measures.   [*Id.* at 89–90].

---

to establish a catch limit] marks the first time in CCAMLR's 40-year history that an established fishery has been completely blocked[.]'"), 19 ("The European Union stated that . . . 'there is no scientific basis for closing the fishery.'"), 20 ("'[T]he U.S.A. does not believe there is a scientific basis to close the toothfish fishery in Subarea 48.3[.]'")].   The United Kingdom, however, issued toothfish fishing licenses on June 1, 2022, in Subarea 48.3 despite the failure of the Commission to adopt a catch limit. [*See* United States' Statement of Material Facts ¶ 25; ECF No. 24 at 74].

[16]     Southern Cross harvested the toothfish with authority from the government of St. Helena and a fishing license from South Georgia and the Sandwich Islands, which set a catch limit of 1,670 tons. [Southern Cross's Statement of Material Facts ¶¶ 42, 46–48].

## LEGAL STANDARD

The Administrative Procedure Act ("APA") "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). A district court reviewing an agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *People for Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 851 F. App'x 896, 900 (11th Cir. 2021).

The parties disagree as to the exact standard by which this Court should analyze the cross motions for summary judgment. The United States argues that this Court should apply the APA's arbitrary-and-capricious standard of review [United States' Reply in Support of Mot. for Summ. J., ECF No. 84 at 1–2], while Southern Cross argues this Court should determine only whether the United States' denial was "in accordance with law" under the APA, [Southern Cross's Response to Defendants' Mot. for Summ. J., ECF No. 82 at 3–4].[17]

After review of the Denial Letter and the parties' arguments, this Court believes that Southern Cross's proposed legal standard makes more sense here. The United States denied Southern Cross's application "because [the United States believed] . . . the toothfish at issue was harvested in contravention of CCAMLR CM 31-01 . . . . Therefore, as provided in the regulations [the United States] may not issue a pre-approval certificate." [Denial Letter, ECF No. 73-1 at 91]. It is clear that

---

[17]     This Court notes the unique posture of this case, and how an analysis of the United States' action here is an awkward fit for APA review. While the United States denied Southern Cross's application to import toothfish through an agency action – the Denial Letter – it did so exclusively because of its interpretation of an international treaty. *See infra.* Thus, the standard of review which seems to be a better fit is one of pure treaty interpretation. Still, because the United States denied Southern Cross's application via agency action, this Court will review the agency's action under the APA, while applying traditional notions of international treaty interpretation.

the United States' decision was based on a pure question of law: whether the failure of the Commission to set a catch limit for toothfish in Subarea 48.3 under CCAMLR prohibited all toothfish harvesting.[18]   Such a pure legal determination by the United States does not comport with the traditional reasons to apply the arbitrary-and-capricious standard.  The United States weighed little evidence and does not seem to have relied on any congressionally-mandated factors.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").  Rather, the United States here denied Southern Cross's application only because of its interpretation of CCAMLR and CM 31-01.[19]  Thus, this Court need only consider whether the United States' interpretation was

---

[18]     The United States attempts to frame this case as one of pure domestic law.  [*See* U.S. Resp., ECF No. 79 at 3 (describing Southern Cross's Motion as an "effort to mischaracterize a domestic regulatory action as a matter of treaty interpretation largely [and] ignores the thrust of the legal issue presented in this case: whether NMFS properly applied domestic regulations that implement a domestic statute, AMLRCA.")].  However, as noted by the United States, AMLRCA and the relevant regulations forbid the importation of any marine living resource harvested in violation or contravention of a conservation measure in force pursuant to Article IX of CCAMLR.  [*Id.* (citing 16 U.S.C. § 2435(3) and 50 C.F.R. § 300.105(h)(2))].  Even if it was exercising its authority under AMLRCA to interpret CCAMLR and CM 31-01, because AMLRCA *requires* the United States to follow the requirements of an international treaty and its regulations, these determinations are indisputably a question of treaty interpretation and whether the United States' interpretation is "in accordance with" international law.  While it is also true that the United States does not have the authority to close fishing in Subarea 48.3 (as this is a determination left to the Commission), AMLRCA and its regulations require the United States to determine whether CCAMLR and CM 31-01 prohibit toothfish fishing in Subarea 48.3.  The United States' view on this issue matters for purposes of importation (at issue here); this Court is not presented with whether an entity should be granted a license to fish or harvest in Subarea 48.3.

[19]     The United States argued at the March 17, 2025 hearing that it considered various factual issues when deciding to deny Southern Cross's application for a preapproval certificate, and that therefore it is entitled to arbitrary-and-capricious review.  [*See* Tr. of Mar. 17, 2025, Hearing ("H'g Tr."), at 32:12–17; 45:23–46:13; 47:24–48:4].  Because of the case law on the interpretation of

"in accordance" with CCAMLR, as the United States is instructed to do pursuant to AMLRCA.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).[20]

An agency action is "not in accordance with the law" when "it is in conflict with the language of the statute relied upon by the agency." *All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 786 (6th Cir. 2008).  Thus, because the relevant statute (AMLRCA) and the relevant regulation (50 C.F.R. § 300.105(h)(2)) incorporate CCAMLR and its conservation measures, if the United States here misinterpreted CCAMLR and CM 31-01, it did not act in accordance with law.

## DISCUSSION

I.   <u>Standing.</u>

### A.  Southern Cross did not need to argue standing at summary judgment.

In their response to Southern Cross's Motion, the United States asserts (briefly) that because Southern Cross does not argue they have Article III standing in their opening brief, the Court lacks jurisdiction to consider either of their two claims.  [U.S. Resp., ECF No. 79 at 2].  This position has no support in law.  No case which the United States cites stands for the proposition that a failure to

---

international treaties, however, this Court believes that the factual issues cited by the United States are factors to consider in the legal interpretation of CCAMLR.  Thus, the United States is not entitled to arbitrary-and-capricious review here.  However, if this Court is incorrect on this point, the legal conclusion is unchanged; the United States' denial of the preapproval certificate would easily survive arbitrary-and-capricious review, even more so than the "not in accordance with law" standard.  Thus, whether this Court uses an "arbitrary-and-capricious" standard or a "not in accordance with law" standard, it reaches the same conclusion.

[20]      This Court cites *Loper Bright* only for the general proposition that federal courts exercise their independent judgment to decide all relevant questions of law arising on review of agency action and not "defer" to any reasonable agency interpretation in this process.  603 U.S. at 392.  However, nothing in *Loper Bright* or its progeny overturned the decades of precedent requiring federal courts to consider and accord great weight to the views of the United States and other signatory nations when interpreting a treaty.  *See Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017).  The law of treaty interpretation, unlike statutory interpretation, is derived in part from the President's Article II powers and, as discussed below, the serious foreign policy and separation-of-powers concerns that flow therefrom.

establish standing in a motion for summary judgment deprives a court of jurisdiction. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Washington State Farm Bureau v. NMFS*, No. C06-388Z, 2006 WL 4914810, at *8 (W.D. Wash. Dec. 20, 2006) (dismissing a case for lack of standing where plaintiffs failed to respond to a motion for summary judgment arguing the plaintiffs lacked standing). The United States had an opportunity to move for summary judgment on the basis that Southern Cross lacked Article III standing but chose not to do so. [*See* U.S. Mot., ECF No. 75]. Regardless, the facts of this case, in which the United States denied Southern Cross a preapproval certificate to import toothfish, demonstrate that Southern Cross has Article III standing to pursue its APA claim. Accordingly, this Court rejects the United States' threshold argument that this Court lacks jurisdiction because Southern Cross failed to affirmatively assert it had Article III standing.

### B. Southern Cross has no standing to pursue its declaratory judgment claim (Count I).[21]

Having said that, for a federal court to adjudicate a dispute the Constitution requires that a plaintiff have standing. *See* U.S. Const. art. III, § 2. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must establish (1) injury in fact, (2) causation, and (3) redressability. *See Lujan*, 504 U.S. at 560–61. The injury in fact which must be shown is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* at 560. Under the causation requirement, the injury must be fairly traceable to the challenged action of the defendant. *Id.* Finally, under the

---

[21]     While the parties did not raise this standing argument in their cross motions for summary judgment, the Court *sua sponte* raised it at the March 17, 2025, hearing and allowed the parties to brief the issue. [*See* H'g Tr. at 28:13–29:13]; *see also* Fed. R. Civ. P. 56(f).

redressability requirement, it must be likely that the injury will be redressed by a favorable decision. *Id.* at 561.

The Declaratory Judgment Act, under which Southern Cross brings Count I, "specifically provides that a declaratory judgment may be issued only in the case of an '"actual controversy."' *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (citing 28 U.S.C. § 2201). "A plaintiff has standing to seek declaratory or injunctive relief only when he alleges facts from which it appears there is a substantial likelihood that he will suffer injury in the future. The remote possibility that a future injury may happen is not sufficient to satisfy the actual controversy requirement for declaratory judgments." *Owners Ins. Co. v. Parsons*, 610 F. App'x 895, 896 (11th Cir. 2015) (cleaned up). A district court may consider a declaratory judgment suit only where a "definite and concrete" controversy exists. *Id.* at 897 (citing *Miccosukee Tribe of Indians of Fla. v. Kraus–Anderson Constr. Co.*, 607 F.3d 1268, 1275 n. 14 (11th Cir. 2010)). "The 'controversy' must be real and substantial admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)); *see Malowney*, 193 F.3d at 1347 ("The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.").

Here, Southern Cross attempts to bring a declaratory judgment count asking this Court to declare that the United States may not deny future applications for preapproval submitted by Southern Cross based on the absence of a CCAMLR conservation measure in force at the time. [Compl., ECF No. 61 ¶ 54]. The clear problem with this request is that it is wholly contingent on future actions of the Commission, the Contracting Parties, and the United States, which are unknowable to this Court or Southern Cross. As discussed below, the Court's analysis of whether the failure of the Commission

to establish a catch limit closes toothfish fishing in Subarea 48.3 is greatly influenced by the views of the United States and the views of the Contracting Parties—which can change and rely upon dynamic factors. *See infra.* This Court can analyze the views of the United States and the Contracting Parties for purposes of this lawsuit regarding toothfish harvested in the 2021/2022 fishing season only because the relevant views were expressed at that time.

Southern Cross argues that it has standing to seek a declaratory judgment because it intends to import Patagonian toothfish from Subarea 48.3 in the future and if it were to obtain relief in this case, it would apply for an International Fishery Trade Permit and preapproval certificates to import toothfish into the United States. [Southern Cross's Post-Hearing Brief, ECF No. 109 at 8–9 (citing ECF No. 86-1 ¶¶ 15–17)]. A simple statement in an affidavit that a party intends to take an action in the future is insufficient to establish an "actual or imminent" injury under Article III. *See Lujan*, 504 U.S. at 564. Just as the plaintiffs in *Lujan* had not actually purchased airline tickets and thus had no standing, Southern Cross here has not actually applied for or received a license to fish in Subarea 48.3, nor are there any facts in the record that it has continuously applied for another preapproval certificate. Accordingly, Southern Cross has not demonstrated that it is entitled to forward-looking relief.

This Court's analysis may very well change in the future if the views of the United States and other Contracting Parties change in the future. Accordingly, a declaratory judgment binding the United States in the future based on these facts is speculative and impermissible. *See Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past injury . . . does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects."); *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006) (finding no injury in fact and thus no standing in an action for declaratory relief where the Plaintiffs claimed future injury was merely that they intended to express their viewpoints in the future in a manner similar to their previous actions). This Court will not bind the United States to an interpretation of a complex international treaty in all instances when no catch

limit is imposed by the Commission– from this point forward for as long as the Commission sets no limit and for whatever reasons.  While this Court can look backwards and declare the correct legal interpretation of CCAMLR, it cannot require the United States to issue preapproval certificates to applicants whenever no catch limit is imposed by the Commission at any time in the future.  To do so would not only be an encroachment by the Judiciary in an area of constitutionally-recognized Executive competence and authority, but also would be an unworkable solution to a dynamic, changing, multi-variate policy area.  Neither this Court, nor the parties, can know what the United States and other Contracting Parties may do in response to the failure of the Commission to set a catch limit (or whether catch limits will be set or not), and granting declaratory relief would unduly restrict the United States in an area governed by international agreements.

Accordingly, Southern Cross does not have Article III standing to bring its first cause of action under the Declaratory Judgment Action, and this Court must dismiss Count I.[22]

### C.  Southern Cross has standing to pursue its APA Claim (Count II).

However, Southern Cross plainly has standing to bring its second count – a violation of the Administrative Procedure Act because the United States' denial of Southern Cross's application for a preapproval certificate establishes an injury in fact.  When a lawsuit "is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . at issue.  If he is, there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."  *Lujan*, 504 U.S. at 561–62.

---

[22]     Even if this Court is in error here and Southern Cross has standing to pursue its declaratory relief claim, Southern Cross still would not be entitled to the relief it seeks for the same reasons this Court finds its APA Review claim to be meritless, as discussed below.

The United States "does not contest that [Southern Cross] had standing when it filed its Complaint in October 2022," but rather argues that subsequent events have rendered Southern Cross's action moot.[23] [*See* Defendants' Supplemental Brief, ECF No. 110 at 6]. Because the United States denied Southern Cross's application for a preapproval certificate (injury and traceability), and Southern Cross now seeks to have this Court state that the denial was not in accordance with law (redressability),[24] Southern Cross has sufficiently demonstrated it has standing to pursue its APA claim. *See Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1260 (11th Cir. 2014); *see also Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016).

Southern Cross has also demonstrated prudential standing to bring its APA claim. A party "suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (cleaned up). A court asks "whether the plaintiff[] fall[s] within the class of plaintiffs whom Congress authorized to sue." *Kurapati*, 775 F.3d at 1260 (11th Cir. 2014) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). The "zone of interests" test is not "especially demanding[.]" *Lexmark*, 572 U.S. at 130. "In applying the zone of interests test, [a court must] first discern the interests arguably to be protected by the statutory provision at issue; [a court] then inquire[s] whether the plaintiff's interests affected by the agency action in question are among them." *Kurapati*, 775 F.3d at 1260–61.

---

[23]     The United States, in its post-hearing briefing, seems to conflate the requirement of redressability under the standing doctrine and mootness. The Court's inquiries into standing and mootness, while related, "differ in respects critical to the proper resolution of this case, so [it] address[es] them separately." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

[24]     Southern Cross's decision not to seek damages does not affect this analysis. [*See* H'g Tr. at 54:14–18].

Here, AMLRCA prohibits importing the importation of "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure in force with respect to the United States[.]" 16 U.S.C. § 2435(3). These interests are "arguably to be protected" by AMLRCA and exist to ensure that the United States does not allow any importation of species harvested in an area of the Antarctic Ocean covered by CCAMLR that would violate its duties under CCAMLR. Southern Cross's interest – importation of toothfish harvested in Subarea 48.3 – was clearly affected by the agency action (denial of the preapproval certificate) and clearly intertwined with the United States' duties under AMLRCA. Thus, Southern Cross's interest is within the zone of interests protected by AMLRCA, and Southern Cross has prudential standing to bring its APA claim.

## II.   The Denial of the Preapproval Certificate is Not Moot.

"A case that becomes moot at any point during the proceedings is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385–86 (2018) (cleaned up) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began." *Wood v. Raffensperger*, 981 F.3d 1307, 1316 (11th Cir. 2020) (citation omitted). Mootness concerns "the availability of relief, not the existence of a lawsuit or an injury." *Id.* at 1317.

However, an exception to the mootness doctrine exists where an injury is "capable of repetition yet evading review[.]" *Am. C.L. Union v. The Fla. Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)). A court may apply this exception when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Wood*, 981 F.3d at 1317 (citing *Nat'l Broad. Co. v. Commc'ns Workers*

*of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988)); *see also Strickland v. Alexander*, 772 F.3d 876, 887 (11th Cir. 2014).

Southern Cross concedes that the toothfish at issue was donated in November 2022, and thus, even if this Court grant's Southern Cross's Motion and requested relief, Southern Cross could not import the harvested toothfish. [*See* H'g. Tr. at 24:4–13, 41:7–11; Decl. of Heather Nicotri, ECF No. 110-1 ¶ 6]. However, while this Court has been presented with no evidence as to the shelf life (or deliciousness) of frozen toothfish, Southern Cross's application meets the standard for "capable of repetition yet evading review." Because the decision to deny the preapproval certificate was made "within a single [fishing] season, the window for litigating a challenge to the agency's decision was far too short." *Safari Club Int'l*, 842 F.3d at 1288. Because the normal timeline of administrative exhaustion in this area and a subsequent federal lawsuit extends beyond a single fishing season (especially in a complicated case like this which necessitates extensive briefing), and because even frozen toothfish expires, decays, or loses marketability at some point (the undersigned expresses no view on the desirability of years-old frozen toothfish), it seems plain enough that this harvested and frozen toothfish would expire before reasonable litigation over the issues presented could be completed.

To further support this point, the United States issued Southern Cross a Notice of Seizure as to the relevant toothfish on October 13, 2022 (less than one month after the United States denied Southern Cross's preapproval certificate on September 15, 2022) which stated that the United States seized and intended to seek forfeiture of the frozen toothfish. [*See* Decl. of Daniel Thomas, ECF No. 109-1 ¶¶ 7–12; *see also* ECF No. 109-1 at 24]. Southern Cross just two days later stated that it was abandoning the toothfish at issue but was not waiving its right to import toothfish. [*See* Decl. of Daniel Thomas, ECF No. 109-1 ¶ 13; *see also* ECF No. 109-1 at 27]. Within one month of the United States' denial of Southern Cross's application for a preapproval certificate, the United States sought

to initiate forfeiture proceedings, which Southern Cross contends would have been futile because the United States already denied the preapproval certificate, and Southern Cross abandoned its rights to the toothfish.  Such a short timeline (one month) is far less than the lifecycle of even the most expedited litigation in federal court.  The issues presented by the Denial Letter and the Notice of Seizure issued by the United States are precisely the type of injury that falls within the exception to the mootness doctrine.

As for the second step of the test, it is "reasonable to expect" that Southern Cross would be subjected to the same action again (another denial of the application by the United States) if it applies for another preapproval certificate when the Commission has failed to establish a catch limit for toothfish.[25]  Southern Cross has sufficiently stated (for purposes of the mootness inquiry of its APA claim) that it intends to harvest toothfish in Subarea 48.3 for importation into the United States in the future and would have attempted to import toothfish in 2022 had Southern Cross's preapproval certificate been granted.  [Decls. of Daniel Thomas, ECF No. 86-1 ¶ 15; ECF No. 109-1 ¶ 15].  Relying on these sworn statements, this Court finds for mootness purposes that it is reasonable to expect that the United States would deny Southern Cross's likely future application for a preapproval certificate based on the same facts.  Accordingly, Southern Cross would likely face the same action again and the second step of the test is satisfied.

Because Southern Cross would likely be unable to receive relief from any court before a toothfish harvest expires and is likely to face a denial of its future application for a preapproval

---

[25]    This fact is sufficient for this Court to find that the issue is not moot, but insufficient for standing for declaratory forward-looking relief, because the tests for the two concepts are distinct. This Court cannot grant declaratory relief in favor of Southern Cross because it is unwilling to bind the United States to all fact patterns going forward involving the failure of the Commission to set a catch limit for toothfish; however, because the Court finds that it is a reasonable expectation that Southern Cross would face similar injury going forward *under these facts*, the issue is not moot.

certificate, this Court finds that the "capable of repetition yet evading review" exception is satisfied, and this lawsuit is not moot.

### III.  The United States' Interpretation of CCAMLR is Convincing.

The Supreme Court's opinion in *Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017), provides this Court with guidance on the proper way to interpret an international treaty to which the United States is a party.  There, the Supreme Court interpreted Article 10 of the Hague Service Convention by considering (1) the text of the treaty and the context in which the words are used, and (2) three extratextual sources:  (a) the views of the Executive, (b) the views of other signatories, and (c) the Convention's drafting history.  *Id.* at 276–83; *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020); *World Holdings, LLC v. Fed. Republic of Germany*, 701 F.3d 641, 651 (11th Cir. 2012).  Following the Supreme Court's guidance, this Court now analyzes these four sources of treaty interpretation to answer whether the failure of the Commission to establish a catch limit of toothfish prevents all toothfish harvesting under CCAMLR.  After a review of all sources of treaty interpretation, this Court concludes "that the Government's construction of [CCAMLR] is most faithful to the Convention's text, purpose, and overall structure."  *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168–69 (1999).

#### A.  The Text and Contexts of CM 31-01 and CCAMLR.

"When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used[.]"  *Pielage v. McConnell*, 516 F.3d 1282, 1287 (11th Cir. 2008) (citing *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699–700 (1988)); *Medellín v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its

text.").[26]  Upon review of the text of CM 31-01, this Court determines that whether toothfish fishing was prohibited when the Commission failed to establish a catch limit is unclear.

To begin, the plain text of CM 31-01 shows that the Commission is (1) required to establish a catch limit, or other measures, if it (2) determines that such measures are necessary.  CM 31-01 states that "the Commission *shall* establish such limitations or other measures, as necessary[.]"  [United States' Statement of Material Facts ¶ 7 (emphasis added)].  "It is undisputed that the word 'shall' imposes a mandatory command.  'Shall' means 'must.'"  *Bufkin v. Collins*, 604 U.S. ___, 145 S. Ct. 728, 737 (2025) (cleaned up) (citing *Shapiro v. McManus*, 577 U.S. 39, 43 (2015) and *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171–172 (2016)).  In this context, the Commission therefore was *required* to establish a catch limit or other measures.

The text of CM 31-01, however, includes an exception to this command – the Commission need only establish a catch limit or other measures if it determines that such measures are necessary.  The relevant portion of CM 31-01 states that, "[f]or each fishing season after 1987/88, the Commission shall establish [catch] limitations or other measures, *as necessary*[.]"  [United States' Statement of Material Facts ¶ 7 (emphasis added)].  The inclusion of the words "as necessary" plainly suggests that catch limitations may not be necessary.  It is certainly plausible that the Commission may review all available science and data and determine that no catch limit is necessary because, say, the

---

[26]     While text and context are given their place of primacy, when it comes to treaty interpretation the Supreme Court and the Eleventh Circuit inform that we are not *only* textualists now.  Binding Supreme Court and Eleventh Circuit precedent squarely recognizes and requires *purposive interpretation* when it comes to treaties and international agreements.  *See Gandara v. Bennett*, 528 F.3d 823, 827 (11th Cir. 2008) (citing Section 325, Restatement (Third) of Foreign Relations Law favorably); *see also* Restatement (Third) of Foreign Relations Law § 325(1) (Am. L. Inst. 1987) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context *and in the light of its object and purpose*.") (emphasis added).

20

toothfish population has exponentially increased.[27]   Had the drafters of CM 31-01 not intended

flexibility for the Commission to adopt only those catch limits that were necessary based on the

available data, they would not have included the words "as necessary;" then, CM 31-01 would have

required the Commission to establish catch limitations or other measures for every fishing season after

1987–1988.  Instead, the drafters chose to add the words "as necessary," and this Court must give

meaning to those words.  *See Pielage*, 516 F.3d at 1288 ("[T]reaties, like statutes, should be construed

so that no words are treated as being meaningless, redundant, or mere surplusage.") (citing *Yapp v.*

*Reno*, 26 F.3d 1562, 1569 (11th Cir. 1994)); *see also Loughrin v. United States*, 573 U.S. 351, 358 (2014)

(noting that it is a "cardinal principle" of interpretation that courts "must give effect . . . to every clause

and word of a statute.").  Accordingly, the Commission need only establish a catch limit of other

measures if they determine that they are necessary – and if the measures are not necessary, then the

Commission need not establish any measures.[28]

     However, what happened here – where the Commission failed to establish a catch limit not

because there was a determination that it was "not necessary" but rather because Russia unilaterally

---

[27]    It is not uncommon for a government to choose intentionally to establish no catch limit of a particular species of fish.  As the Florida Keys National Marine Sanctuary has noted, there is no recreational or commercial limit on the number of lionfish (deemed an invasive species) that an individual can collect in Florida.  *See Lionfish Removal*, NOAA: FKNMS, http://floridakeys.noaa.gov/permits/lionfish.html#:~:text=There%20is%20no%20recreational%20or,individual%20can%20collect%20from%20Florida (last visited Feb. 5, 2025).

[28]    Even though a catch limit is not the *only* measure that can satisfy CM 31-01, there is no evidence before this Court that a catch limit was decided to be "unnecessary" (or that the measures in place, discussed *infra*, were all that was "necessary").  Such a determination would involve a complex factual analysis that this Court is unable to perform at this juncture (and an analysis in which the United States would deserve *Skidmore* deference).  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  For this Court to grant Southern Cross's Motion, Southern Cross would have to convince this Court that the Commission did not establish a catch limit on toothfish because it either believed that (1) a catch limit was not necessary or (2) other measures in force were sufficient to satisfy CM 31-01.  Southern Cross has not done so.

blocked consensus and prevented the Commission from establishing or deciding anything – represents a breakdown of the normal process.  The text of CM 31-01 is silent and therefore ambiguous as to what happens when the Commission breaks down in this manner.[29]  In this regard, neither the United States' textualist argument (in which it focuses on the word "shall"),[30] nor Southern Cross's textualist argument (which focuses on the words "as necessary") are particularly informative.  While based on the text of CM 31-01 *alone*, it is possible that the Commission's failure to establish a catch limit for toothfish would not close all toothfish fishing in Subarea 48.3, Southern Cross fails to convince this Court that a catch limit was not established because the Commission determined one wasn't necessary. Thus, this Court must look beyond the plain text of CM 31-01 to determine whether toothfish fishing is prohibited in Subarea 48.3.

Relatedly, Southern Cross argues that even if the Commission were required to adopt "limitations or other measures" under CM 31-01, the Commission did adopt other conservation measures, CM 23-01, CM 33-01 and CM 32-02, that applied to the harvest at issue and thus satisfied the requirements of CM 31-01.  [Southern Cross Mot. at 13].  CM 23-01, titled "Five-day Catch and Effort Reporting System," was "adopted in accordance with [CM] 31-01" and requires each Contracting Party to obtain from its vessels "total target catch by species and its total by-catch reported

---

[29]     Southern Cross even admits as such.  [*See* H'g Tr. at 10:24–11:2 (Southern Cross stated that when the Commission imposes no catch limit, CM 31-01 "doesn't really say what the result is.  We know that the result is there's no -- if it's correct, there's no conservation measure in place, but we don't know what the consequences of no conservation measure is.").

[30]     The United States' argument here would consider the words "as necessary" as mere surplusage to be ignored—because the natural reading of the sentence requires the Commission to create only those conservation measures that are necessary.  [*See* U.S. Resp. at 5].  The United States' interpretation ignores the "Surplusage Canon," by which courts should give meaning to every word.  *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect (verba cum effectu sunt accipienda).  None should be ignored."); *Lowe v. S.E.C.*, 472 U.S. 181, 208 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

by species . . . and total days and hours fished for that period[.]"  [ECF No. 73-1 at 233–34 ¶ 2].  CM 23-01, however, assumes that a catch limit has been established.[31]  Without a catch limit imposed under CM 31-01, much of CCAMLR's Executive Secretary's duties under CM 23-01 are meaningless. Thus, CM 23-01 makes sense in context *only if* a catch limit is in place; and where, as here, no catch limit existed, it cannot be said that CM 23-01 necessarily applies to the harvest of toothfish.

Southern Cross's citation to CM 33-01 similarly fails to convince this Court that the Commission authorized "other measures" under CM 31-01.  CM 33-01, titled "Limitation of the by-catch of *Gobionotothen gibberifrons*, *Chaenocephalus aceratus*, *Pseudochaenichthys georgianus*, *Notothenia rossii* and *Lepidonotothen squamifronsin* Statistical Subarea 48.3," facially does not set any limitation on the catch of toothfish (known officially as *Dissostichus eleginoides*).[32]  Further, to the extent that it does apply (as these species could be caught as "by-catch" in a toothfish fishery), CM 33-01 only applies to any "directed fishery" in Subarea 48.3; where, as here, the Commission set no catch limit for toothfish, no directed fishery for toothfish exists.[33]  Lastly, CM 32-02 is insufficient to be considered an "other measure"

---

[31]  [*See* ECF No. 73-1 at 233–34 ¶ 5 ("[T]he Executive Secretary shall notify all Contracting Parties engaged in fishing activities in the area . . . the date upon which the total allowable catch is likely to be reached for that season.  In the case of exploratory fisheries, the Executive Secretary shall also notify the total aggregate catch for the season to date in each small-scale research unit (SSRU), group of SSRUs, or research block for which a specific catch limit (including a zero catch limit) is in place, together with an estimate of the date upon which the total allowable catch is likely to be reached[.]), ¶ 6 ("At the end of every six reporting periods, the Executive Secretary shall inform all Contracting Parties of the total catch taken during the six most recent reporting periods, the total aggregate catch for the season to date together with an estimate of the date upon which the total allowable catch is likely to be reached for that season."), ¶ 7 ("If the estimated date of completion of the total allowable catch is within five days of the date on which the Secretariat received the report of the catches, the Executive Secretary shall inform all Contracting Parties that the fishery will close on that estimated day or on the day on which the report was received, whichever is the later.")].

[32]  *See Conservation Measure 33-01 (1995)*, CCAMLR:  Conservation & Mgmt., http://cm.uat.ccamlr.org/en/measure-33-01-1995 (last visited Feb. 20, 2025).

[33]  While toothfish fishing obviously occurred here, because the Commission did not explicitly authorize any fishing via a catch limit, it cannot be said that the *Commission* established any directed fishery for the 2021/2022 season.

under CM 31-01.  [Southern Cross Mot. at 18; H'g Tr. at 11:21–23].  CM 32-02 merely states that there is no explicit prohibition on toothfish harvesting in Subarea 48.3— but does not represent a decision of the Commission *to establish* no catch limit of toothfish and does not by itself vitiate the remainder of this Court's analysis.

The text of CM 31-01 is not the only text for this Court to consider.  In addition to CM 31-01, the plain text of Article II of CCAMLR is also particularly relevant to this Court's analysis.  Article II specifies that any harvesting shall be conducted in accordance with three principles of conservation: (a) prevention of decrease in the size of any population to levels below those which ensure its stable recruitment, (b) maintenance of ecological relationships between harvested, dependent, and related populations of Antarctic marine living resources, and (c) minimization of the risk of changes to the marine ecosystem which are not reversible.[34]  Because the United States' interpretation of CM 31-01 and CCAMLR *must comport with these principles*, its decision to grant a preapproval certificate for any fish harvested there (based on its interpretation of CCAMLR) must take these principles into account.

An interpretation of CM 31-01 that completely prohibits toothfish fishing in the absence of an authorized catch limit most closely follows the principles set out in Article II.  If the lack of a catch limit meant that the fisheries were not closed, unlimited fishing could occur—and that unlimited harvesting result would necessarily contravene the three conservation principles of Article II.[35]  There

---

[34]     CAMLR Convention art. II.

[35]     Notably, CCAMLR defines "conservation" to include "rational use."  Southern Cross argues that the text of CCAMLR shows that the lack of a catch limit does not result in a total ban of fishing because under the United States' definition of "rational use" in CCAMLR, "fishing is expected."  [*See* Southern Cross Mot. at 14 (citing the Denial Letter)].  The term "rational use," however, is not defined in the treaty.  To determine the ordinary meaning of an undefined term courts "often look to dictionary definitions for guidance."  *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018).  Merriam-Webster defines "Rational" as "relating to, based on, or agreeable to reason."  *Rational*, Merriam-Webster  Dictionary,  http://www.merriam-webster.com/dictionary/rational  (last  visited Feb. 6, 2025).  Accordingly, the conservation principles of Article II allow reasonable harvesting of a

would be no mechanism to ensure that the population of toothfish did not decrease to the point that the species became endangered (which would violate art. II(a)); there would be no mechanism to ensure that the harvested, dependent, and related populations of Antarctic marine living resources could be maintained (which would violate art. II(b)); and there would be no mechanism to ensure that no irreversible changes to the Antarctic marine ecosystem did not occur (which would violate art. II(c)). Clearly, an interpretation that would allow unlimited fishing of toothfish in Subarea 48.3 would contravene these principles because otherwise, under a convention *designed* to protect Antarctic marine living resources, an entity would be able to deplete an entire population of fish with no recourse for the Commission. Such a result would be absurd, illogical, and contravene the text of principles set forth in the Convention. *See Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 385 (2d Cir. 2004) ("Whenever possible, interpretations of a treaty that produce anomalous or illogical results should be avoided.").

The preamble of CCAMLR, which this Court must consider, additionally aids this Court in its determination of the meaning of CM 31-01. *See Gandara v. Bennett*, 528 F.3d 823, 827 (11th Cir. 2008) ("[A] treaty must be interpreted as a whole *in light of its object and purpose, including the preamble.*") (emphasis added). The preamble to CCAMLR states that the Contracting Parties recognize the importance of protecting the integrity of the Antarctic ecosystem, are conscious of the urgency of conserving Antarctic marine living resources, and recognize the responsibility to protect and preserve the Antarctic environment.[36] Once again, an interpretation of CCAMLR and CM 31-01 that allows for unlimited fishing would by no means further the goals of CCAMLR to protect the Antarctic ecosystem—as any Contracting Party hoping to exploit the harvest of toothfish could unilaterally object to a catch limit and then harvest as much toothfish as it desires without regard for the species'

---

particular species. That conservation principle (properly interpreted) does comport with an interpretation that would allow *unlimited* harvesting of that marine life resource.

[36]     CAMLR Convention Preamble.

conservation.  Such an interpretation would expressly defy the Preamble's goals of protecting the ecosystem and conserving Antarctic marine living resources.

This view is further supported by the context in which CM 31-01 and CCAMLR were drafted. CCAMLR was adopted against the backdrop of the exploitation and over-harvesting of Antarctic marine living resources and was an attempt to ensure these populations and ecosystems could survive. In the middle of the 20th century, just before CCAMLR was adopted, Antarctic finfish, crabs, squid, krill, seals, and whales were being over-fished and exploited.[37]  This is the context in which CCAMLR was adopted as a "multilateral response to concerns that unregulated increases in krill catches in the Southern Ocean could be detrimental for Antarctic marine ecosystems particularly for seabirds, seals, whales and fish that depend on krill for food."[38]  With this backdrop, the Contracting Parties agreed to a complex scheme to ensure that Antarctic resources would survive and no country could individually deplete the resources.  Southern Cross's proposed interpretation of CCAMLR and CM 31-01 would offend the main reason and purpose that animated the passage of CCAMLR. Additionally, allowing one nation to refuse to agree on a catch limit for a particular fish only to then be able to harvest that fish in unlimited quantities would contravene the expressed purposes of CCAMLR and CM 31-01.

Next, the context of CM 31-01 supports the United States' view that toothfish harvesting was prohibited entirely when no catch limit was agreed.  In 1984, the Commission's Scientific Committee stated that toothfish in Subarea 48.3 were "being heavily fished and in need of conservation measures."[39]  By 1989, the Commission and its Scientific Committee were concerned about the rapid

---

[37]     *History of the Convention*, *supra* note 4.

[38]     *CAMLR Convention*, *supra* note 3.

[39]     CCAMLR Secretariat, *supra* note 14, at ¶ 7.9–7.10.

rise of catch levels of toothfish in Subarea 48.3.[40]  CM 31-01 was adopted by the Commission in 1986, two years after the Commission noted that toothfish were being heavily fished and in need of conservation measures.  It is plainly obvious that CM 31-01 was effectuated to preserve the population of toothfish, and any interpretation of CM 31-01 should be in accordance with its purpose.  As emphasized above, an interpretation of CM 31-01 that allows any Contracting Party to engage in unlimited fishing merely by refusing to agree to a catch limit would create a perverse incentive that could lead to overfishing and the destruction of marine ecosystems in Subarea 48.3 – which were the exact reasons CM 31-01 was adopted in the first place.

Southern Cross argues that because "the Commission has prohibited fishing at some times and in some areas[,]" the absence of an explicit prohibition in Subarea 48.3 means that "absent conservation measures, fishing occurs in" Subarea 48.3.  [Southern Cross Mot. at 18–19].  Specifically, Southern Cross cites to the Commission's prohibition on icefish fishing in Subarea 48.3 via conservation measures to argue that if "the lack of a catch limit under CM 31-01 resulted in a total ban . . . the Commission would not have adopted by consensus—three times—a prohibition of directed fishing of icefish."  [*Id.* at 19].  However, it does not logically follow that just because the Commission sets an explicit prohibition via a catch limit that this is the *only* way a prohibition can exist.  Even if the Commission could have adopted an explicit ban on toothfish fishing via a conservation measure, there are good reasons (as discussed above) that the failure to adopt a catch limit also closes fishing – namely, to prevent a single bad actor from blocking consensus with the sole purpose to fish without regard to conservation of marine life under a convention designed to protect marine life.

---

[40]     CCAMLR Secretariat, Report of the Eighth Meeting of the Commission ¶ 104 (1989), http://meetings.ccamlr.org/system/files/e-cc-viii.pdf.

Southern Cross also argues that the context of CM 31-01 when judged within the structure of CCAMLR supports their view that toothfish fishing can occur in the absence of a catch limit.  [*See, e.g.,* H'g Tr. at 11:3–20; 12:11–20].  The consensus structure of CCAMLR, Southern Cross argues, would be "destroyed" if toothfish fishing were prohibited because it would impose a "veto structure where if one country doesn't want fishing in a particular subarea, all they have to do is not vote for a catch limit."  [*Id.* at 12:11–20].  However, the opposite is also true – a country wishing to fish with no catch limit, despite any scientific evidence that a catch limit should be imposed, could unilaterally block consensus and engage in unlimited fishing, even if doing so violates Article II of CCAMLR's requirements discussed above.  This logic does not convince.

Finally, this Court notes that CM 31-01 requires that "limitations of catch or equivalent measures shall be based upon the advice of the Scientific Committee, taking into account any data resulting from fishery surveys around South Georgia."  [United States' Statement of Material Facts ¶ 7].  The facts of this case show that there was no affirmative decision to have no catch limit for toothfish – the failure to establish a catch limit occurred *despite, not because of,* the Scientific Committee's recommendation.  The failure to establish a catch limit had nothing to do with a scientific basis, rather, it was due to one bad actor – Russia – and its decision to prevent CCAMLR from working as was required (and obligated to work by all Contracting Parties).  Because there was no decision based on the Scientific Committee to have no catch limit, this Court cannot say that the Commission *decided* that no catch limit was "necessary" under CM 31-01; thus, the text of the third paragraph of CM 31-01, at issue here, was never met in the first place.

To the extent that Southern Cross argues the text of CM 31-01 *alone* supports their position that toothfish fishing is permitted in the absence of a catch limit, other textual and contextual methods of interpretation cut against that view strongly.  The text of the Preamble, Article II of CCAMLR, which countries must consider when interpreting the remainder of the treaty and its conservation

measures, and the contexts in which CCAMLR and CM 31-01 were entered, all support the United States' view that all fishing of toothfish is prohibited when the Contracting Parties fail to establish a catch limit. Still, this Court will continue its analysis by considering the remainder of the sources by which a Court can interpret an international treaty.

### B. Extratextual Sources of Treaty Interpretation.

The interpretation of an international treaty is a question of the parties' intent. *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014). While Courts begin with the text of the treaty, "[t]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Pielage*, 516 F.3d at 1287.

This Court now analyzes three extratextual sources recognized as authoritative by the Supreme Court and the courts of appeals in matters of treaty interpretation:  (a) the view of the United States on the interpretation of CM 31-01; (b) the post-ratification understanding of the other Contracting Parties on the interpretation of CM 31-01; and (c) CCAMLR's and CM 31-01's drafting history. Two of these factors weigh heavily in favor of the United States here, and third factor is equivocal.

#### 1. *The Views of the United States*

"Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." *El Al Israel Airlines, LTD.*, 525 U.S. at 168; *see Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 2010) ("[G]iven the nature of the [treaty] and the unique relationships it implicates, the 'Executive Branch's interpretation of a treaty is entitled to great weight.'") (quoting *Abbott v. Abbott*, 560 U.S. 1 (2010)). "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) (citing *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)).  This principle of treaty interpretation is repeatedly recognized in

precedent because an agency's interpretation of a treaty is "especially informative 'to the extent it rests on factual premises within the agency's expertise.'" *Loper Bright Enters.*, 603 U.S. at 402 (citing *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n. 8 (1983)). "Such expertise has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'" *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[41]

The Executive Branch in this case asserts that all toothfish fishing is prohibited in Subarea 48.3 in the absence of a Commission-imposed catch limit. While the views of the United States on this matter do not dispose of the issue or require deference to its views as a matter of law, they certainly weigh strongly in favor of granting the United States' motion.

This result is particularly true given the complex international implications which arise from this case. CCAMLR is a complex international treaty dependent, in relevant part here, on a consensus model in which action must be taken by all the Contracting Parties together. This structure necessitates that the Executive Branch works with other nations to try to preserve the Antarctic Ocean ecosystem, a daunting task that requires efficient decision-making and diplomatic strategy. Such a task, under our Constitution, is for the Executive Branch and should be largely free from judicial micro-management. *See generally Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023), *cert. denied sub nom.*, 144 S. Ct. 343 (2023) (noting that "some questions [regarding international politics] can be answered only by the political branches.").

---

[41] The United States, through the NMFS, certainly has expertise in the structure and processes of CCAMLR and the Commission, conservation of marine life, and management of toothfish fisheries on both a domestic and international level. Such expertise is entitled to great weight, especially considering the Court's limited knowledge of the political dynamics of the Commission and the scientific bases for appropriate catch limits of Antarctic marine life.

2.  *The Postratification Understanding of the Contracting Parties*

"[B]ecause a treaty ratified by the United States is an agreement among sovereign powers, court] have also considered as aids to its interpretation [] the postratification understanding of signatory nations." *Diaz v. Miami Air Int'l, Inc.*, No. 3:21-CV-413-TJC-SJH, 2024 WL 4651871, at *2 (M.D. Fla. Nov. 1, 2024) (internal quotation marks omitted) (citing *Medellín*, 552 U.S. at 507).  A court has a "responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Id.* (citing *Air France v. Saks*, 470 U.S. 392, 399 (1985)).  "Our role is limited to giving effect to the intent of the Treaty parties.  When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am., Inc.*, 457 U.S. at 185; *see Water Splash, Inc.*, 581 U.S. at 282 (noting the "considerable weight" courts give to the views of other parties to a treaty).  This court can consider the practices of the parties in the application of the agreement, known in contract law as course of dealing, when interpreting the treaty.  *See Cornejo v. Cnty. of San Diego*, 504 F.3d 853, 858 (9th Cir. 2007) (citing Restatement (Third) of Foreign Relations Law § 325(2) (1987)).

Given this clear body of law, this Court considers and recognizes the postratification understanding and the actions of the Contracting Parties, who mostly all agree that toothfish fishing is prohibited in the absence of a catch limit.  For instance, the European Union, a member of CCAMLR in its own right, expressed regret for the Commission's inability to establish a catch limit and stated that "there is no scientific basis for closing the [Subarea 48.3 toothfish] fishery."[42]  Other

---

[42]     CCAMLR Secretariat, Report of the Fortieth Meeting of the Commission ¶ 6.28 (2021), http://meetings.ccamlr.org/system/files/e-cc-40-rep.pdf.

countries made similar statements, expressing their concerns that the toothfish fishery would be closed in the absence of an established catch limit.[43]

The near unanimity of the Contracting Parties in believing that toothfish fishing is prohibited in Subarea 48.3 in the absence of a catch limit is a factor that weighs heavily in favor of the United States' position here. As noted above, this Court is limited in its ability to require the Executive Branch to take actions or establish interpretations that implicate foreign policy and the relationship with foreign nations. This is especially true when the vast majority of the Contracting Parties agree with the United States that toothfish fishing is prohibited.

---

[43]     *See id.* ¶ 6.22 (the United Kingdom stated that Russia's block on establishing a catch limit "marks the first time in CCAMLR's 40-year history that an established fishery has been completely blocked, and it results in a failure of CM 31-01."). It is notable that since this meeting, the United Kingdom has allowed toothfish fishing to occur in Subarea 48.3. *See* CCAMLR Secretariat, *Report of the Forty-Second Meeting of the Commission* ("CCAMLR-42") ¶ 147 (2023), http://meetings.ccamlr.org/system/files/meeting-reports/e-cc-42-rep_2.pdf (Argentina noted that only the United Kingdom has fished in Subarea 48.3 after the Commission's failure to adopt a toothfish catch limit); CCAMLR Secretariat, *Report of the Forty-First Meeting of the Commission* ("CCAMLR-41") ¶ 123 (2022), http://meetings.ccamlr.org/system/files/meeting-reports/e-cc-41-rep.pdf ("[T]he UK does not agree that fishing for particular species in Subarea 48.3 is permitted only where there has been agreement to a catch limit for that species. Such an interpretation would have the effect of reversing the normal position under the Convention."). Still, the views of the other Contracting Parties are overwhelmingly in favor of a prohibition of fishing in the absence of a catch limit. CCAMLR-42 ¶ 4.56 (("China noted that vessels participating in a fishery without an agreed catch limit would be conducting IUU fishing."), ¶ 4.53 (Argentina noted that it "regrets that the Commission has not been able to adopt a conservation measure that would have allowed the operation of the toothfish fishery in Subarea 48.3 during the 2023/2024 season, as required by CM 31-01 for each fishing season. We recall that in the absence of a conservation measure, the [toothfish] fishery shall be closed in this Subarea."), ¶ 148 (Uruguay stated that it supported Argentina's position that fishing is not authorized in Subarea 48.3 in the absence of a catch limit); CCAMLR-41 ¶ 124 (Russia stated its belief that the failure to effectuate a toothfish catch limit in Subarea 48.3 meant that "the toothfish fishery was closed for 2022[.]"); *but see id.* ¶ 7.32 (noting that Norway stated that "'Non-renewal of CM 41-02 does not lead to prohibition against fisheries in Subarea 48.3: None of the provisions in the Convention may be interpreted as imposing a general prohibition against fishing in Subarea 48.3. Any such prohibition would have to be establish[ed] by a conservation measure."). This Court notes that these previous statements, including Norway's belief that toothfish fishing was not prohibited, occurred a year after the Commission failed to establish a catch limit for the 2021/2022 fishing season at issue here.

Southern Cross also argues that because the Commission first established a catch limit of toothfish in Subarea 48.3 in 1990 (four years after CM 31-01 was ratified), and toothfish fishing occurred between 1986 and 1990, the history of CM 31-01 shows that the failure to establish a catch limit did not previously and should not now prohibit toothfish fishing. [Southern Cross Mot. at 5–6]. However, the Contracting Parties' consistent actions since 1990 (wherein a catch limit was imposed in every year until 2021) and their nearly-uniform recent statements clearly convince this Court more than the actions of the Contracting Parties from 1986-1990. *See Cornejo*, 504 F.3d at 858.

3. *Drafting History*

When interpreting an international treaty, courts can consider the treaty's drafting history, including its negotiation history. *See Water Splash, Inc.*, 581 U.S. at 281 (citing *Medellín*, 552 U.S. at 507 and *Schlunk*, 486 U.S. at 700).

Southern Cross emphasizes that the Commission's 1986 report noted that it adopted Conservation Measure 7/V (the precursor to CM 31-01), which the report explained "*would permit* the Commission . . . to fix limitations of catch for the 1987/88 season as a binding measure. The recommendation *would permit* a similar procedure for future seasons after 1987/88." [Southern Cross Mot. at 19–20 (emphasis added)].[44]  This language, Southern Cross argues, "reveals that the purpose of CM 31-01 was to 'permit' the Commission to impose catch limits for the 1987/88 fishing season and future seasons . . . . The drafters certainly understood that there might not be a catch limit for the 1987/88 fishing season or for future ones." [Southern Cross Mot. at 20].

---

[44]     CCAMLR Secretariat, Report of the Fifth Meeting of the Commission ¶ 53 (1989), http://meetings.ccamlr.org/system/files/e-cc-v.pdf (emphasis added).

The United States, on the other hand, highlights that at the Fifth Meeting of the Commission, some Contracting Parties had a

> "divergence in views . . . over limitations of catch in Subarea 48.3. Members carrying out fisheries in this area took the position that any such limitations of catch for the 1986/87 season should be fixed at the level of catch for the 1985/86 season and indicated that they did not intend to exceed those limits. A number of other Members took the view that such a catch level was inconsistent with the advice of the Scientific Committee which recommended steps to ensure recovery of depleted fish stocks."[45]

The Commission agreed that it would establish any catch limits at the following year's annual meeting, "when data resulting from planned fishery surveys in the area would be available."[46] The United States argues that this evidences the Commission's views that "to conserve Antarctic marine living resources affected by fisheries in Subarea 48.3, harvest activities in Subarea 48.3 should be conducted in accordance with necessary catch limits or equivalent measures based on the advice of the Scientific Committee as informed by survey data about the health of fish stocks." [U.S. Mot. at 14].

Beyond these dueling snippets, the parties present this Court with little information about the drafting history of either CM 31-01 or CCAMLR. This Court finds neither argument particularly compelling, especially when considered against the full weight of all the other evidence. First, the use of the word "permit" in the Report of the Fifth Meeting of the Commission in no way answers dispositively whether all fishing must cease if no catch limit is established. No catch limit on toothfish had ever been established before 1986, so Conservation Measure 7/V did in fact "permit" the establishment of a catch limit thereafter, but this Court cannot glean from the use of the word "permit" in a report describing a meeting of the Commission whether the failure to effectuate a catch limit (nearly forty years later, when the catch rate of toothfish increased dramatically) prohibited all fishing or not. Second, the Commission's decision whether to establish a catch limit based on

---

[45]    *Id.* ¶ 51.

[46]    *Id.* ¶ 52.

scientific evidence in 1986 fails even to suggest an answer to the question presented here. Put simply, the drafting history of CM 31-01 and CCAMLR at best are inconclusive to answer the question of whether toothfish can be fished in Subarea 48.3 in the absence of a catch limit and, at worst, irrelevant to that question. Thus, this Court's analysis of the extratextual sources of treaty interpretation depends exclusively on the views of the United States and the other Contracting Parties, both of which weigh heavily in favor of the United States' position here.

*   *   *

If our law required an international treaty to be interpreted like a domestic statute, or like a private contract with an integration clause, Southern Cross might have landed a big one here.[47] Because our law requires the consideration of CCAMLR's context, its animating principles and purposes, the parties' post-ratification practice, and the views of the contracting parties and the Executive Branch regarding its interpretation, this big one from Southern Cross is the one that got away.[48]

To recap, this Court concludes that the factors discussed above, recognized clearly in binding precedent, weigh in favor of the United States' interpretation of CCAMLR and CM 31-01. While the text of CM 31-01 *all by itself* might favor Southern Cross's interpretation that toothfish fishing is not prohibited in the absence of a catch limit (because the text of CM 31-01 requires regulations on toothfish fishing if they are "necessary," and there may be scenarios in which no regulations are required), the facts of this case, the context of CM 31-01, and the overall text, structure, and context of CCAMLR all support the United States' interpretation.

---

[47]     *See Cornejo*, 504 F.3d at 858 n.9 ("The dissent ignores the canons that apply to international agreements, and otherwise goes off track by treating this case as if it involved a *statute* instead of a *treaty*.") (emphasis in original).

[48]     Depending on the age of the reader, *see* Ernest Hemingway, The Old Man and the Sea (1952); Katy Perry, *The One That Got Away* (Capitol Records 2010).

CCAMLR was created to *protect* Antarctic marine life, and its plain text requires that this Court consider the principles and purposes animating the treaty's adoption when interpreting it. Furthermore, the extratextual factors of treaty interpretation, that binding precedent requires to be considered, clearly support the United States' view.  The drafting history of CCAMLR and CM 31-01 presented by the parties to this Court is, at best, neutral and does not aid this Court's analysis in any significant way.  Finally, the views of both the United States and the other Contracting Parties deserve great weight and support the United States' position.  Considering all these factors in reaching the best interpretation of the treaty and its implemented regulations, this Court concludes that the United States' interpretation is correct.  Accordingly, this Court holds that when the Commission fails to adopt a specific catch limit of toothfish in Subarea 48.3, all toothfish fishing is prohibited in Subarea 48.3 under CCAMLR and CM 31-01.

**CONCLUSION**

It is **ORDERED AND ADJUDGED** that the United States' Motion [**ECF No. 75**] is **GRANTED,** and Southern Cross's Motion [**ECF No. 73**] is **DENIED.** The United States acted in accordance with law when it denied Southern Cross's application for a preapproval certificate to import toothfish harvested in Subarea 48.3 in the 2021/2022 fishing season. The Clerk of Court is instructed to **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on March 29, 2025.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record